THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOHNNY WALLS *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 1—88—0920, 1—88—1097 cons.

Opinion filed September 30, 1991.—Modified opinion filed October 18, 1991.

Randolph N. Stone, Public Defender, of Chicago (Stephanie L. Ellbogen, Assistant Public Defender, of counsel), for appellant Johnny Walls.

Michael J. Pelletier and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant Charles Byrd.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Gael O'Brien, and Veronica X. Calderon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Defendants Walls and Byrd were both charged with the murder of Beverly Hemphill (also known as Kimberly or Nookie) and the attempted murder of Monique Hill. (Ill. Rev. Stat. 1985, ch. 38, pars. 8—4, 9—1(a).) The defendants were tried together before a jury and found guilty on both charges. Walls was sentenced to consecutive terms of 35 and 15 years, and Byrd was sentenced to consecutive terms of 30 and 10 years. They both appeal their convictions and sentences, and this court has consolidated their appeals.

The facts of this case are tragic, not only because they tell a tale of how one young girl lost her life and another was seriously injured, but also because they reveal the stark reality of what life is like within the "Projects" of the Chicago Housing Authority. This case is but another reminder that housing for the poor in Chicago is entrenched with gangs which present a constant threat to the safety and well-being of all the residents and that awareness of the gangs and the various gang affiliations has become necessary for one's very existence.

The evidence indicates that at about 4:30 p.m. on April 3, 1986, Monique Hill, who lived at 1159 North Cleveland, an apartment building within what is known as the "Cabrini Green" housing project of the Chicago Housing Authority, decided to go with her friend, Beverly, to visit their boyfriends at 502 West Oak, near the Cabrini Green Project. To go from Hill's apartment building to the other apartment building required that the girls walk across a blacktop area known as "the field." Apparently "the field" is a sort of no-man's land located at the center of the Cabrini Green Project

and bordered by the apartment buildings which are "controlled" by various rival gangs active within Cabrini Green.

As the girls walked across the field, accompanied by Monique's sister Carmen, they noticed a group of approximately 10 young men playing basketball. Defendants Walls and Byrd were among the group, along with Aron Buckles and Greg Fleming. Buckles, Walls and Byrd were all known to be members of the gang known as the Black Gangster Disciples and, while Monique was apparently not a member of a gang, Beverly was known to be a member of a rival gang known as the Mickey Stone Queens, a female faction of the Cobra Stones. Due to these affiliations, Buckles began to verbally attack Beverly, telling her that she had no right to walk across the field. The girls then ran the rest of the way to 502 West Oak.

After their visit, at about 8:30 p.m. that same day, Monique and Beverly left their boyfriends' apartment to return to Monique's apartment. It was dark as Monique and Beverly began the walk back across the field. For this reason Monique could not identify the person she saw step away from the building at 1119 North Cleveland and fire five shots in their direction. All Monique knew was that she felt "something hot" under her right eye and then realized that she had been hit and was bleeding. Beverly called out that she too had been hit and told Monique to run for help as she fell to the ground.

Monique ran toward her apartment and came upon her sister Carmen and Carmen's boyfriend Fred. They all got into a car and drove to the place where Beverly lay unconscious. Then Carmen and Fred drove Monique and Beverly to Henrotin Hospital. Beverly, who was 15 years old at the time, died from a gunshot wound to her chest. Monique, who was also 15 years old, suffered a gunshot wound to her right cheek, which required surgery and plastic surgery. At the time of trial a two-inch scar was still visible under her right eye.

Shortly after the shooting took place, Officers Virgil Jones and Merle Brown, both assigned to the Public Housing Unit of the Chicago police department working within Cabrini Green, responded to a police radio message regarding shots fired at 1119 North Cleveland. They proceeded to that location and walked to the back of the building. There they had a conversation with a person who was known to the officers and who had supplied them with reliable information in the past. This unidentified informant disclosed that he had not seen the actual shooting, but that just after hearing the shots he observed Gregory Fleming and Johnny Walls run up the

stairs of the building at 1117 North Cleveland. Based on this information, the officers proceeded to Fleming's apartment, number 706, in the building at 1117 North Cleveland. They were permitted entry into the residence by Fleming's mother and shown to a rear bedroom where Fleming and Walls were located.

What happened next is subject to dispute and, consequently, a more detailed accounting will be given later in this opinion. However, for the sake of brevity, let it suffice to say that there was evidence that the officers knocked at the bedroom door and that Fleming opened it, that both Fleming and Walls were in the room, undressed, with Walls lying on a small bed and their clothes lying in a heap on the floor. Officer Jones, who knew both Fleming and Walls and was aware of their gang affiliations, informed them that there had just been a shooting outside the building and that they had been seen running upstairs after the incident. Officer Jones then asked them what they knew about the shooting.

Despite the fact that both Fleming and Walls claimed that they knew nothing about the shooting, they were asked to accompany the officers to the station at 365 West Oak for further questioning. They were allowed to dress and were taken downstairs to the officers' police car, patted down for weapons and then transported to 365 West Oak, the Public Housing Unit station. They were later transported to Area 6 Violent Crimes Unit at Western and Belmont.

Throughout the night the police continued their investigation of the shooting, at the scene as well as at the hospital and at Area 6. Several possible witnesses, in addition to Walls and Fleming, were taken to Area 6 for questioning. Walls and Fleming were each interviewed, individually, around midnight and two or three times during the early morning hours. They remained at the station although they both continued to deny any knowledge of the incident. Then, around 9 o'clock the following morning, when Detective O'Brien confronted Fleming with information they had received through their investigation, Fleming informed the police that Walls had fired the gun that shot the girls.

Based upon this and other statements received from various witnesses, Walls was formally placed under arrest on the afternoon of April 4, 1986. After his arrest he made certain admissions concerning the shooting.

In the course of their investigation the police were also told that Charles Byrd gave a gun to Walls just prior to the shooting. For this reason, on April 4, 1986, Officer Dennis Davis and his

partner drove to Byrd's residence and questioned him concerning the shooting. Byrd denied any involvement in the shooting, but admitted that he knew the whereabouts of the gun and accompanied the officers to his grandmother's residence, where a gun was recovered. After assisting in the retrieval of the gun, Byrd was questioned at Area 6 and then released. Byrd made additional statements to the police on April 17, 1986, but was not arrested for his role in the shooting until May 5, 1986. Subsequently, both Walls and Byrd were named in an indictment for the murder of Beverly Hemphill and the attempted murder of Monique Hill.

Prior to trial Walls filed a motion to quash his arrest and suppress the statements he made subsequent to his arrest. The motion was denied. Walls also moved for severance, citing the confrontation clause and potentially antagonistic defenses as reasons to grant the motion. The trial court, however, denied the motion and the defendants were tried jointly.

As stated earlier, both Walls and Byrd were found guilty as charged and sentenced to consecutive terms. They now appeal, both raising the following issues: (1) whether the State failed to rebut the *prima facie* showing that it had utilized its peremptory challenges of prospective jurors in a racially discriminatory manner, contrary to the so-called *Batson* rule (see *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712) and whether the trial judge erred by failing to assess the legitimacy of the State's asserted reasons for exercising its peremptory challenges once it found that a *prima facie* showing of discrimination had been made, (2) whether the trial court erred by refusing to instruct the jury concerning accomplice testimony, and (3) whether it was proper to have sentenced defendants to consecutive, rather than concurrent, sentences. Walls raises two additional issues: (1) whether the trial court erred by denying his motion to quash his arrest and suppress his statements, and (2) whether the trial court erred in denying his motion for severance. Since the *Batson* issue affects both appeals, this court will direct its opinion first to that issue.

■ Peremptory challenges have long been a part of Illinois and American procedural law. Typically, through the exercise of such challenges, an attorney is able to preclude a certain number of prospective jurors from sitting on the jury without providing a reason or explanation for such action. (See *Batson v. Kentucky*, 476 U.S. at 119-22, 90 L. Ed. 2d at 102-04, 106 S. Ct. at 1735-36 (Burger, C.J., dissenting).) In *Batson v. Kentucky* the United States Supreme Court changed this practice in certain instances. Relying on Federal

constitutional principles, the *Batson* Court placed its first limitation on the use of peremptory challenges in the jury selection process, ruling that peremptory challenges could not be used to discriminate against venirepersons based on race. The basis for such a rule is the defendant's right to a trial by his peers, the prospective juror's right to participate on the jury, and the damage that such discriminatory procedures have on the community as a whole. See *Batson*, 476 U.S. at 86-87, 90 L. Ed. 2d at 80-81, 106 S. Ct. at 1717-18.

■ To effectuate its ruling, the Court placed upon trial courts the duty to conduct a three-step analysis whenever a defendant objects to the prosecutor's use of peremptories alleging that discrimination motivated the challenges. (*Hernandez v. New York* (1991), 500 U.S. ____, 114 L. Ed. 2d 395, 111 S. Ct. 1859.) In the first step of this analysis, the trial court must determine whether the defendant made out a *prima facie* showing that the prosecutor utilized his peremptory challenges in a purposefully discriminatory manner. (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 412, 539 N.E.2d 1172.) For a *prima facie* showing, the defense must initially show that the State used peremptory challenges to remove from the venire persons who are of the same race as the defendant. However, this alone is insufficient. The defense must also come forth with "other relevant circumstances" that would tend to support a finding that discrimination was the reason that a juror was challenged. *People v. Henderson* (1990), 142 Ill. 2d 258, 284, 568 N.E.2d 1234.

Only when the trial court determines that a *prima facie* showing has been established may it move on to the second step of the analysis, where it becomes the prosecutor's duty to provide his rationale for having challenged the prospective jurors for whom the defense has raised a question. At this point the trial court has the obligation to assess the explanations given to determine whether it appears that the State has set forth legitimate, race-neutral, case-specific reasons to rebut the inference of discrimination or whether, after considering all the relevant circumstances including the explanations, an inference of racial discrimination persists. *People v. Hope* (1990), 137 Ill. 2d 430, 454, 560 N.E.2d 849.

●3 Previously, our Illinois Supreme Court, cautioning against "collapsing" the three-step analysis (see *People v. Hope*, 137 Ill. 2d at 456-57), held that when reviewing a *Batson* claim a *prima facie* case could not be presumed from the mere fact that a circuit court invited the State to provide an explanation for the peremptory challenges used. (*People v. Garrett* (1990), 139 Ill. 2d 189, 564 N.E.2d

784.) Consequently, courts of review were often called upon to consider, on appeal, whether a *prima facie* case had been established, even after the State was asked to provide its reasons for utilizing peremptory challenges. However, in the recent United States Supreme Court opinion, *Hernandez v. New York* (1991), 500 U.S. ____, 114 L. Ed. 2d 395, 111 S. Ct. 1859, the Court held that "once a prosecutor has offered a race neutral explanation for using the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."

■ Furthermore, while courts of review may still be asked to determine the correctness of the trial court's decision on the ultimate issue of whether a *Batson* violation has occurred, in light of *Hernandez* they should not make an independent review of a trial court's rejection of a *Batson* claim, but rather, may only overturn a trial court's finding on the issue of discrimination if it is clearly erroneous. (*People v. Johnson* (1991), 218 Ill. App. 3d 967.) A trial judge's findings, because they constitute a credibility determination, must be given great deference. (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21; *People v. Harris* (1989), 129 Ill. 2d 123, 175, 544 N.E.2d 357.) Nevertheless, if a reviewing court finds that peremptory challenges were used in a discriminatory manner, it is an error of constitutional proportions, requiring reversal no matter how heinous the crime nor how guilty the defendant. *People v. McDonald* (1988), 125 Ill. 2d 182, 200, 530 N.E.2d 1351.

In the present case, both defendants are black. During *voir dire* of the venire the prosecutor peremptorily challenged four prospective black jurors. Immediately defense counsel moved for mistrial, asserting that the State violated *Batson* by utilizing its peremptory challenges in a racially discriminatory manner. The defense noted that four out of the six jurors challenged by the State were black and that all but one black prospective juror had been excluded by the State.

In response to the motion the trial court stated:

"Based on Batson address [*sic*], I think, 4 out of 6 blacks is prima facie."

The trial court then asked the prosecutors to "make some kind of record," soliciting from the prosecutors their reasons for excusing the four black prospective jurors. The State did not concede that a *prima facie* case had been made, but proceeded to provide

the court with its reasons for excluding the four black jurors. The court then ruled against the defendants' motion for mistrial, stating:

> "Well, I've read *Batson* a couple of times. I've only had—this is only the second time the motion has been made when I've been a Judge. But it seems in their wisdom, the Court hasn't really given us any guidelines other than the—thus it appears to be that if the State appears to be moving black jurors off the panel, just because their [*sic*] black, when there are black defendants, as we have here, that its my obligation to see that the defendants receive a fair trial. And attempt to, as best I can, if I think it is appropriate, to have a hearing.
>
> And I did it based on the numbers as opposed to anything more specific than that. ***
>
> In any event, the State has given me reasons for what they wanted to do. I can't say that I agree or disagree with those reasons, because I'm not the trial attorney and I haven't conducted their examination with a view toward what I believe are jurors who would be apropos to my cause. Since I'm suppose to be in—attempting to remain neutral, I look at the jurors to see whether or not I believe they would be neutral jurors and not one sided.
>
> So, it is inappropriate for me at this point, not having viewed the jurors with that in mind to now sit back and try to make a decision as to what I would do were I the trial attorney, to see whether or not the State's reasoning is reasons I might have, were I to be State's Attorney, which is as I think, what Mr. Hynes and Mr. Hennelly [the prosecutors] have put in the record.
>
> And, of course, the defense was saying, well, that's all baloney they're doing it for other reasons. But, of course, they wouldn't have made the motion, if they were going to agree those people shouldn't have been jurors.
>
> And so, I think, that the—unless I see something more, all the—of the reasons which are stated, are reasons which may be appropriate. The Appellate Court wants me to have a hearing, where we put the State under oath and decide whether or not they're telling the truth about this, I suppose, that's what we have to go to.
>
> But at this point, I don't see anything in the record which indicates from the reasons that were given, that these people

could not have been excluded for good trial tactic. And for reasons other than race.

And I might add that we have had all those decisions about people for cause to be taken off the jury and when they weren't dismissed for cause, attorneys on both sides excused them for peremptory reasons. And those are all done for trial tactic reasons and for gut feeling and all those reasons that lawyer's [*sic*] exercise peremptories.

I'm not convinced there is bad faith, and I'm going to deny the motion."

The defendants appeal, contending that the State failed to rebut the *prima facie* showing of discrimination in utilizing its peremptory challenges and that the trial court failed to properly implement the *Batson* ruling by refusing to hold the State to its burden of producing specific, race-neutral reasons for its challenges and by refusing to assess the legitimacy of the reasons that were proffered by the State.

The State argues that defendants made no *prima facie* showing of purposeful discrimination despite the trial court's ruling that they had, but that, in the event that this court should find that a *prima facie* case had been made, the trial court properly determined that there had been no purposeful discrimination in the exercise of peremptories.

It may be true, as the State contends, that the trial court erred by deciding the preliminary question of whether a *prima facie* case of discrimination had been established based solely on the number of black potential jurors excluded. However, this is not to say that we find that the trial court erred in finding that a *prima facie* case was shown. Nor must we reach this issue since, based on the recent *Hernandez* decision, whether a *prima facie* case had been established became moot once the trial court heard the State's proffered explanations and ruled on the ultimate issue of discrimination. Therefore, we need only consider whether the trial court erred in rejecting the defendants' *Batson* claim.

As already stated, defendants argue that the State failed to give race-neutral reasons for challenging the four potential black jurors. We agree.

Despite the fact that the *Batson* case was decided over five years ago, with an army of appellate and supreme court decisions interpreting and applying it, prosecutors, it seems, continue to exclude Afro-American jurors without giving race-neutral reasons for exercising their challenges, thereby adding to the tremendous ex-

pense of criminal litigation. Part of the problem has stemmed from the fact that no supreme or appellate court has provided a definitive determination as to what is, in fact, a race-neutral reason for excluding a prospective juror but, instead, has left it to the discretion of trial courts to be decided on a case-by-case basis. But the fact remains that prosecutors have often been unable to articulate reasonable explanations for excluding members of a defendant's race and thereby have jeopardized the entire prosecution. Such is the case here.

There were five black individuals on the venire and the State challenged four of these prospective jurors. In only one case, *i.e.*, where the juror stated that she was "scared to death" of being on a jury, did the State make a challenge for cause[1]. In all other instances the State utilized its peremptories to exclude the prospective black jurors. Upon request by the trial court, the State provided facially neutral reasons for those challenges. However, upon closer scrutiny and when examining the reasons given in the context of the venire involved in the case, it is apparent that the reasons given were merely pretextual.

For example, the State indicated that one potential juror was challenged because she was an unmarried mother of children who were about the same age as the defendants and because she indicated that she was affiliated with the organization known as the Eastern Star. However, there were several other jurors, both male and female, who were accepted by the State, despite the fact that they were parents of children having approximately the same age as the defendants. More importantly, there was no indication from any of the jurors that their parental status would make them biased against the State since the victims were also teenagers. Therefore, the State clearly did not provide a legitimate explanation by citing the parental status of one black juror.

We are also unpersuaded that the companion reason given, *i.e.*, the juror's membership in the Eastern Star, was a legitimate race-neutral reason since the record shows that the prosecutor was not even aware of the nature of this organization. The prosecutor indicated that he believed it to be a religious affiliation so that the juror's membership in this group indicated strong religious beliefs. However, the prosecutor never questioned the juror about the orga-

---

[1]Defendants do not contend that the State's peremptory challenge of this juror was racially motivated, and thus, we shall be concerned only with the challenges of the other three black prospective jurors.

nization to determine its true nature (it is the female affiliate of the Freemasons) nor did the prosecutor question that juror or any of the other prospective jurors concerning their religious beliefs.

With regard to the second black juror excluded, a 20-year-old black woman, the State alleged that it excluded her because her age was close to that of the defendants and because she allegedly "stared at" the defendants. However, the State accepted two white males, ages 22 and 24, who might have been more likely to identify with the defendants. In fact, if anything, this juror might have been more inclined to be against the defendants since the victims were young girls. Nor should the fact that she looked at the defendants, an action which neither the court nor the defense attorneys noticed, disqualify someone from serving on the jury.

The reason given for excluding the last black juror was that she resided in the vicinity of another "highly-publicized" gang-related incident in which the prosecutor had been involved and because her husband worked for a company where the prosecutor had many friends. However, the State gave no indication of how or why either of these two factors, even if true, caused it to believe that the juror would have been biased or detrimental to its case in any way. For this reason we must find such explanation untenable.

■ Even though our review is limited to a determination of whether the trial court's decision was clearly erroneous, and despite the deferential standard to be applied, we feel compelled to conclude that in this case a mistake has been made. We find that the trial court erred, to the extent that it assessed the State's reasons at all, in finding that no discriminatory intent remained after the State proffered its rationale for excluding three of the five black venirepersons.

We also agree with the defendants that the trial court abdicated its duty to assess the State's reasons to determine whether they were pretextual. The excerpt from the trial court's ruling indicates that the trial court was either unaware of or unwilling to fulfill its obligation to evaluate the State's exercise of its peremptory challenges. Although we may understand the trial court's reluctance to second-guess the State since prior to *Batson* there were no restrictions on the prosecutor's right to utilize peremptories for no reason at all, both the trial courts and reviewing courts must attempt to make a meaningful assessment of the State's reasoning for challenging certain prospective jurors if the *Batson* decision is to be followed in practice and not just theory.

For the reasons cited above, we reverse the trial court's ruling with respect to the *Batson* claim and remand both cases to the trial court so that new trials may be had.

Ordinarily, the fact that this court has concluded that both defendants are entitled to new trials would alleviate the need to address the remaining issues raised by the defendants. However, because Walls contends that he is entitled to an outright reversal of his conviction because the trial court erred by denying his motion to quash his arrest and suppress the statements he made subsequent to his arrest, we shall address this question.

Walls testified both at the suppression hearing and at trial. Since testimony adduced at trial may be considered when reviewing the propriety of a trial court's ruling on motions of this sort (*People v. Redd*, 135 Ill. 2d 252, 289, 553 N.E.2d 316), we shall consider Walls' testimony from both proceedings.

Walls testified that on April 3, 1986, he was 17 years old and that during the evening he had been walking around in the area of Cabrini Green with some friends, until about 7:30 p.m., when he entered the building at 1117 North Cleveland accompanied by Gregory Fleming. While waiting for the elevator, they heard the sound of shots being fired and then ran up the stairs. They first went to the "candy store" at apartment 1204 and then to Fleming's apartment on the seventh floor, where they began watching TV in Fleming's bedroom. About 25 minutes later, they heard a knock on the bedroom door and found that there were two police officers there to see them.

Walls claimed that the officers accused him and Fleming of being responsible for the shooting and then demanded that they go with them to the police station. Walls also claimed that they were searched and handcuffed before being placed in the police car and transported to the station at 365 Oak Street. At the Oak Street station, he and Fleming were kept handcuffed and placed in separate rooms. About an hour later they were transported to Belmont and Western, fingerprinted, and again placed in separate interview rooms, which were about 15 feet by 15 feet in size.

Although he stated that he was not handcuffed in this room, he was required to remain there for about 40 minutes before Detective Rothgeb came to question him. Then, when he told the detective that he knew nothing about the shooting, he was not told that he could leave. Instead, he was kept in the room throughout the night and interviewed two or three more times during that time, even

though he continued to maintain that he knew nothing about the shooting.

Walls further testified that the following morning he was questioned by two other detectives. In the first interview he told the detectives that he knew nothing about the shooting. In response the detectives threatened to "bounce him off the wall like a racquetball" and then left the room. Forty-five minutes later the detectives returned and Walls told them that he had heard "on the street" that Ryan Butler had done the shooting. After making this statement, he claimed that he was taken to a different interview room and "slammed" against a wall and hit on the head two or three times. He was then returned to the first interview room and was not spoken to again until 4:30 p.m., at which time he again told the detectives that Ryan Butler was responsible for the shooting. At this interview he also admitted that he had been present, in front of the building at 1119 North Cleveland along with Gregory Fleming, Charles Byrd and Ryan Butler, when Butler pulled out a gun and fired shots in the direction of some "dudes."

According to Walls, sometime after making this last statement, an assistant State's Attorney came to speak with him and he repeated the same story. However, detectives then told him that Byrd, Fleming and Butler were accusing him of the shooting, so he gave a statement in which he confessed to firing the gun. This confession was later correctly recorded by a court reporter and signed by Walls.

In his appeal, Walls contends that he was "under arrest" from the time he was taken from Fleming's apartment or that, if he wasn't arrested initially, he was illegally detained, without probable cause, for an excessive period of time. In either event, he argues that his subsequent statements to the police should be suppressed as the fruit of his illegal arrest and detention.

Despite the fact that arrest without probable cause has been considered illegal in Anglo-American jurisprudence since the adoption of the Magna Carta in 1215 A.D., such arrests seem almost commonplace in Cook County, if the number of appeals involving the issue is any criterion. Furthermore, the State's response to such appeals is generally the same—consent. However, given the circumstances, we often find such explanations disingenuous. Such is the case here.

Even if we were to discount much of what defendant states, it cannot be denied, and the State admits, that there was no probable cause to arrest Walls when he was taken to the police station on

the evening of April 3 or when he was kept in a small interview room overnight without a bed, despite his repeated statements that he knew nothing about the shooting. Still, the State argues that Walls was not illegally arrested. It contends that it was proper for the trial court to have found that Walls freely consented to accompany the officers to the police station for questioning and that he remained there voluntarily until the next morning, at which time Gregory Fleming implicated him and he was arrested with probable cause. Alternatively, the State argues that Walls' confession need not be suppressed, despite the illegal seizure, because his statements were sufficiently purged from the taint of the illegal arrest by intervening attenuating circumstances.

■ The "accepted test" of whether a person should be deemed "arrested" for purposes of the fourth amendment is whether a reasonable person in defendant's shoes would have believed himself arrested. (*Hicks v. United States* (D.C. Cir. 1967), 382 F.2d 158; *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) In the present case, Walls was aware that the police officers reasonably believed, because of information received from an informant, that he was at least a possible witness to the shooting incident, although he was not necessarily a suspect nor was he the focus of their investigation. The fact that officers drove Walls to the police station does not automatically require a finding that he was in custody at the time. *People v. Gorman* (1991), 207 Ill. App. 3d 461, 565 N.E.2d 1349.

■ It is of some significance that Walls was not singled out to be taken to the police station for questioning, but rather was accompanied by his friend Fleming. Furthermore, there were several other people at the station house for questioning about the incident, a circumstance of which Walls was apparently aware. These facts militate against a finding that defendant was "under arrest" at the time that he was taken from Fleming's apartment. (See *People v. Redd*, 135 Ill. 2d at 290.) For this reason, we do not feel that Walls was under arrest at the time that he was initially brought to the police station.

■ However, a finding that Walls was not initially under arrest should not be the end of the inquiry, since a legal arrest may become an illegal detention with the passage of time. (*People v. Booker* (1991), 209 Ill. App. 3d 384, 568 N.E.2d 211; *People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046.) It would appear from the evidence available to this court that the circumstances in this case are nearly identical to the circumstances in

*People v. Young* (1990), 206 Ill. App. 3d 789, 564 N.E.2d 1254, wherein this court found it less than credible that a defendant would freely choose to remain in a small interrogation room at the police station overnight, sleeping on the floor, when he had already been questioned by the police and denied any knowledge of the incident being investigated. Here, too, we believe that the State failed to carry its heavy burden in demonstrating that a teenager's stay in the police station overnight was voluntary.

We are not unsympathetic to the plight of the police in investigating crimes of this sort. Yet we cannot condone the infringement of constitutional rights and find it difficult to believe, as the State must necessarily contend, that citizens typically agree to spend extended periods of time at police stations, kept in small windowless rooms, waiting for the police to conduct their investigations and obtain probable cause for their arrest. (See also *People v. Gordon* (1990), 198 Ill. App. 3d 791, 556 N.E.2d 573.) For this reason, we must find that the trial court's ruling was manifestly erroneous and that defendant was illegally detained without probable cause.

■ Nevertheless, as noted in the cases of *Booker* and *Young*, cited above, a finding that defendant's detention was unlawful does not automatically require the suppression of statements made subsequently. Unless the confession is shown to be the product of the illegal detention or obtained as a result of the "exploitation of the illegal arrest," the statement may be deemed purged of the original taint and need not be suppressed. (*Booker*, 209 Ill. App. 3d at 395, *Young*, 206 Ill. App. 3d at 803.) The question is whether there were sufficient attenuating circumstances to allow the court to find that the confession was " 'sufficiently an act of free will to purge the primary taint of the unlawful invasion.' " *People v. White* (1987), 117 Ill. 2d 194, 222, 512 N.E.2d 677, quoting *Wong Sun v. United States* (1963), 371 U.S. 471, 486, 9 L. Ed. 2d 441, 454, 83 S. Ct. 407, 416-17.

■ We believe that the record contains some support for a finding that Walls' confession was not a product of his detention, but rather, resulted from the fact that he had been confronted by the police with the statements of other witnesses who had implicated him as the shooter. (See *People v. Franklin* (1987), 115 Ill. 2d 328, 504 N.E.2d 80 (confrontation with inculpatory evidence may be sufficient attenuation to purge taint of illegal arrest).) However, because the trial court found that the arrest was legal and it did not consider whether sufficient attenuating circumstances existed to break the causal connection between the arrest and the confession

and because the record does not appear sufficiently clear for us to make an independent ruling on this matter, we leave it to the trial court to determine this issue.

Consequently, although a new trial has been ordered for both defendants, we are unable to determine the admissibility of Walls' inculpatory statements. The trial court may determine, on remand, whether there were sufficient attenuating circumstances to purge the taint of the illegal detention from the subsequent statements so that they may used in the new trial.

However, whether or not the trial court determines that Walls' confession was tainted "fruit," outright reversal would not be warranted, since there appears to be adequate evidence to permit a fact finder to find Walls guilty beyond a reasonable doubt, even without his confession.

For the reasons stated above, the convictions and sentences entered against defendants Walls and Byrd are hereby reversed and the cases remanded for further proceedings consistent with this opinion.

Reversed and remanded.

LORENZ, P.J., and GORDON, J., concur.