(No. 89159.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DEDRICK COLEMAN, Appellant.

*Opinion filed October 18, 2002.—Rehearing denied December 2, 2002.*

RARICK, J., took no part.

KILBRIDE, J., dissenting.

Office of the State Appellate Defender, of Chicago (John E. Horn and H. Elizabeth Kelley, both of Tinley Park, of counsel), for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and

Renee Goldfarb, James E. Fitzgerald and Celeste Stewart Stack, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GARMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Dedrick Coleman, was convicted of the April 26, 1989, first degree murders of Lance Hale and Avis Welch. He was also convicted of armed robbery and home invasion. Defendant waived the right to be sentenced by a jury and the circuit court subsequently sentenced him to death for the murders. Defendant received prison sentences for his other convictions. This court affirmed defendant's convictions and death sentence on direct appeal (*People v. Coleman*, 158 Ill. 2d 319 (1994)) and the United States Supreme Court denied *certiorari* (*Coleman v. Illinois*, 513 U.S. 881, 130 L. Ed. 2d 143, 115 S. Ct. 215 (1994)). In 1995, defendant filed a petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122—1 *et seq.* (West 1994)), which the circuit court dismissed without an evidentiary hearing. On appeal, this court reversed that decision and remanded the cause for an evidentiary hearing on certain issues raised in the petition. *People v. Coleman*, 183 Ill. 2d 366 (1998). Following an evidentiary hearing, the circuit court denied the petition and this appeal followed (134 Ill. 2d R. 651(a); 155 Ill. 2d R. 304(b)(3)).

BACKGROUND

Trial Proceedings

The murders of Lance Hale and Avis Welch occurred in the first-floor apartment of a two-flat home in Chicago on April 26, 1989. The first-floor apartment was a known "drug house" owned and operated by Alex McCullough. Defendant knew McCullough through his employment in

McCullough's drug operation. McCullough was also the boyfriend of defendant's sister. About one month before the murders, defendant and McCullough had argued about defendant's alleged theft of cocaine and $2,000.

At trial, Aldene Lockett, who lived in the second-floor apartment of the two-flat, testified that at around 5:30 a.m. on April 26, 1989, she heard voices coming from the first-floor apartment. A short while later, she heard a gunshot and something falling. Two more shots later rang out, and Lockett heard a door open. At this time, she looked out her window and saw a dark-complected young black man between 5 feet 6 inches and 5 feet 8 inches tall leave the apartment. The man was wearing all black clothing and sunglasses. Lockett later related what she had seen to police officers investigating the murders.

Eventually, police connected defendant to the drughouse murders, due, in large part, to defendant's shooting of McCullough five days later on May 1, 1989. Several persons were present at the time of the McCullough shooting, and defendant told them he wanted it said that he shot McCullough in self-defense. Nevertheless, some of these witnesses later turned themselves in to the police and informed them of defendant's true role in McCullough's shooting, as well as his involvement in the double homicide at the drug house. As a result, defendant participated in a lineup that was viewed by Aldene Lockett on May 2, 1989. At trial, Lockett testified that one of the lineup participants "looked like he fit the height and description" of the man she had seen leave the drug house. Lockett further told police that the man had been wearing sunglasses. The police then asked each of the lineup participants to put on sunglasses. All but one of the participants complied. According to Lockett, the participant who did not put on the sunglasses was the same participant who had the weight and height of the

man she had seen leave the drug house. On cross-examination, Lockett stated that she did not positively identify anyone from the lineup, but merely told the police that the man who did not put on the glasses "could have been" the same man she had seen leave the murder scene because "he had the same height, and build, and color."

Chicago police detective Tony Maslanka testified that he and his partner, Detective Carroll, conducted the lineup that Lockett viewed. According to Maslanka, Lockett told him that one of the men in the lineup, identified by Maslanka as defendant, "looked like the individual she saw leave the first-floor apartment *** in regard to height, complexion, and physical build." Maslanka stated that because Lockett had seen the suspect leave the building wearing sunglasses, each of the lineup participants was asked to put on a pair of sunglasses. All of the participants in the lineup complied, with the exception of defendant. Lockett again stated to Maslanka that the man who did not put on the sunglasses "was the individual whom she saw that day in question with regard to height, physical build, and complection [*sic*]." On cross-examination, Maslanka admitted that Lockett did not positively identify defendant as the man she had seen leave the scene of the murders. Rather, Maslanka characterized her identification as "tentative" because Lockett had told him that she had not been wearing her glasses when she saw the suspect leave the building and that she was nearsighted. As stated, defendant was convicted and sentenced to death for the murders.

## Post-Conviction Proceedings

In his post-conviction petition, defendant alleged that the State violated his right to due process and a fair trial by concealing material evidence that was favorable to the defense and by using perjured testimony to obtain the convictions. In support of this claim, defendant attached

to his petition the affidavit of Aldene Lockett. In this 1995 affidavit, Lockett states that she saw the gunman's face as he was leaving the first-floor apartment and that she remembers "recognizing it from the neighborhood." At a later date, Lockett saw a man "on the block" who looked like the gunman. According to the affidavit, while at the lineup, Lockett "felt that the police were trying to get [her] to single out the male who refused to put on the shades, because they went back to him in the lineup and told [her] that this was the guy [they] picked up for the murders. [She] told them that this guy was not dark enough to be the guy who had come out of the downstairs apartment." Lockett also states in her affidavit that she does not "remember seeing the guy who refused to wear the shades during the police lineup in the neighborhood before" and that she remembers "telling the States Attorney, Michael Kelly, about how this guy in the lineup didn't look like the guy [she] saw come out of the downstairs apartment, but [Kelly] would always say something to try and convince [her] that he was the right guy." Finally, Lockett states that Assistant State's Attorney Kelly and his investigators "would call me every two or three days to go over my story to make sure it didn't change." In exchange for her trial testimony, the investigators promised to move her to her home state of Alabama or to find her a new residence in Chicago. After one year had passed and Lockett was ready to move, she called the State's Attorney's office but was told that Kelly no longer worked there. Lockett's affidavit further states that no one from the defense team ever contacted her. Defendant's amended petition also alleged ineffective assistance of counsel based on this affidavit, in addition to counsel's failure to interview Lockett. On appeal from the circuit court's order dismissing defendant's petition without an evidentiary hearing, this court determined that, since the State had filed a motion to dismiss

defendant's petition, the factual allegations of Lockett's affidavit must be taken as true, and that the circuit court had failed to do so in its dismissal of the petition. Accordingly, this court remanded the cause for an evidentiary hearing as to defendant's claim regarding Lockett's trial testimony and as to his claim of ineffectiveness of trial counsel regarding the alleged failure to interview Lockett.

On remand, defendant's post-conviction counsel filed a motion for discovery, requesting that the State turn over (1) its file on the case, (2) any and all exculpatory evidence in the State's possession, and (3) the personnel files of John Hynes and Michael Kelly, the assistant State's Attorneys who prosecuted defendant. The circuit court granted the motion as to (1) and (2), but denied it as to (3). Defendant's counsel also issued subpoenas to the Office of Professional Conduct (OPS) for its files on Maslanka. The City's counsel filed a motion to quash the subpoenas. At a hearing on the motion, the City's counsel revealed that the subpoenaed records contained eight complaints against Maslanka, five of which were not sustained and three of which were completely unfounded. The circuit court granted counsel's motion to quash, finding no basis for reviewing Maslanka's file. The court also denied post-conviction counsel's request to take the depositions of Maslanka, Hynes, Kelly, and Nicholas Panarese, defendant's trial attorney.

At the evidentiary hearing, post-conviction counsel asked Lockett to review her entire affidavit and then asked if the affidavit was true. Lockett replied that it was. On cross-examination, Lockett testified that the morning of the shooting was "gloomy" and that she saw the gunman's face for less than a second. She could tell that he was a dark-skinned black male of medium height and build. Lockett testified that she is nearsighted and was not wearing her glasses when she saw the man walk

out of her building. When asked if she remembered telling a detective who interviewed her the next day that she had never before seen the man who walked out of the downstairs apartment, Lockett stated that she could not remember. The prosecutor noted paragraph 10 of Lockett's affidavit, which stated that at a later date, Lockett remembered seeing a man on the block who looked like the man she saw after the shootings. Lockett admitted that, in a 1999 videotaped interview she gave to post-conviction counsel, she said that she did not remember that part of her affidavit.

Regarding the lineup that Lockett viewed after the shooting, she testified that she did not tell Maslanka that defendant was of the same height, build, and color as the man she saw walk out of her building. Lockett admitted that she could have so testified at the trial, but she did not know why she would have done so, as the man who walked out of her building after the shooting was darker than defendant. Lockett remembered testifying at defendant's trial that in the lineup she saw "one young man that looked like he fit the height and description." She also remembered that she testified that the man who refused to put on the sunglasses matched the height and weight of the man she saw leave her building. Lockett did not recall testifying that she thought the man she picked out of the lineup was the gunman; she said he "could have been" and he had the same "height, build and color." Lockett stated that the reason she did not testify at the trial that the gunman had a darker skin color than the man she picked out of the lineup was because "[they] didn't ask [her]." Lockett then said, "I don't know. I can't remember ten years ago. It's been a long time."

Lockett recalled that at defendant's trial, she was asked if the police said anything to her prior to viewing the lineup. She answered that they told her not to be

afraid, that the men could not see her, and to wait until the men "came into the screen" before making any identification. Lockett testified at the evidentiary hearing that she called the State's Attorney's office about a year after she testified at trial, seeking Kelly's help on relocating to another apartment. However, Kelly was no longer an assistant State's Attorney and no one from the State's Attorney's office helped her relocate. Regarding her statement in her affidavit that she was never contacted by any attorneys or investigators working for the defense, she admitted at the evidentiary hearing that in her 1999 videotaped interview with post-conviction counsel, she "probably" stated that she was uncertain to whom she had spoken to 10 years ago. She testified that she could not remember talking to anyone other than Kelly. Lockett stated that she could have spoken to others, but she does not remember now. She also testified at the evidentiary hearing that she "could have" stated in her affidavit that she remembered recognizing the gunman from the neighborhood. She told post-conviction counsel in the videotaped interview that she did not remember saying that in her affidavit. In her testimony at the evidentiary hearing, Lockett stated that she saw this man a few months after the trial and she became afraid. However, she did not call the police or Kelly.

Vernon Jasper, former investigator for the Cook County public defender's office, testified that he assisted defense counsel in defendant's trial. He does not recall interviewing Lockett during his investigation or being requested to do so by defense counsel. Jasper testified that he has no recollection of working on defendant's case. He could have interviewed Lockett and forgotten about it.

Maslanka, a 24-year veteran of the Chicago police department, testified that he and his partner were assigned to do a lineup for Lockett that included defendant.

After viewing the men in the lineup, Lockett told Maslanka that defendant had the same physical appearance and complexion as the gunman. Maslanka denied saying anything to try to get Lockett to pick defendant out of the lineup.

On the next hearing date, post-conviction counsel moved to reopen his cross-examination of Maslanka on the grounds of newly discovered material relating to certain judgments against the City of Chicago resulting from incidents in which Maslanka allegedly "tortured victims." Counsel alleged that at least two settlements had been obtained against Maslanka and/or the City of Chicago. Counsel alleged that Maslanka had been investigated by the Office of Professional Standards (OPS) at least once and that he had been suspended by the Chicago police department for misconduct in one case. When the circuit court asked counsel what relevance this had to defendant's case, counsel replied that the issue is whether Maslanka falsified his police report to leave out what Lockett had told him and, in these other cases, Maslanka omitted from his police reports the fact that he had participated in the torture of several suspects. The circuit court characterized counsel's allegations against Maslanka as conclusory and irrelevant and denied the motion.

In his motion for additional discovery regarding Maslanka, defendant identified six incidents of alleged physical abuse of subjects in custody. The motion alleged that lawsuits had been filed and that at least two judgments were obtained against Maslanka and/or the City of Chicago. Defendant alleged that Marcus Wiggins' lawsuit alleged torture and police report falsification and that Wiggins obtained a settlement of the suit. Defendant also alleged that Donald Torrence filed suit for physical abuse and failure to follow established procedures and obtained a settlement. In addition, defendant alleged that others,

including Tyrone Burnett, sued Maslanka and the City of Chicago for false arrest and malicious prosecution and obtained a settlement. Defendant further alleged that Maslanka was suspended for "misconduct" in the Wiggins case. Defendant alleged that the State had committed a violation of *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97 (1963), by failing to turn over this evidence prior to Maslanka's testimony at the evidentiary hearing.

In an affidavit filed by post-conviction counsel, Torrence stated that in 1988 Maslanka and another officer accosted him at his home and that Maslanka struck him on the head with his gun while Torrence was in handcuffs. Torrence filed suit and settled the case for $2,100. In another affidavit, Raymond Mack stated that Maslanka and another officer forced him to don sunglasses and a cap during multiple lineups. Mack stated that, after doing so, he did not look like anyone else in the lineup. Tyrone Burnett stated in an affidavit that he was arrested in July 1996 and that Maslanka deliberately drove his police car into Burnett, causing serious injuries. Burnett filed a lawsuit that was later settled. The circuit court denied defendant's motion.

At the continued evidentiary hearing, Nicholas Panarese, defendant's trial counsel, testified that he tried numerous times to interview Lockett. On the first attempt, Panarese went with his two investigators, Vernon Jasper and Mort Smith, to Lockett's apartment. Lockett declined to talk to them. Panarese called Lockett on the telephone two or three times, attempting to interview her. However, as soon as he identified himself, Lockett would refuse to talk to him. Panarese did not make any written memoranda of his failed attempts to interview Lockett. He did not question Lockett at the trial about her refusal to talk to him about the case. Neither did he question Lockett about the State's offer to relocate her.

Panarese did not want to "get into the fact that she may or may not have been threatened." Panarese denied being angry at defendant for filing a complaint against him with the Attorney Registration and Disciplinary Commission. Post-conviction counsel also questioned Panarese about his bill for services rendered on defendant's behalf, noting that Panarese had requested approximately $23,000 and that this amount had been reduced by the trial judge. Panarese testified that approximately $7,600 of this amount was requested to reimburse his investigators. Panarese did not make note on his bill of the time he spent trying to interview Lockett because he was not able to talk to her. The circuit court sustained objections to further questioning about Panarese's bill and about whether any court had previously found that Panarese had provided ineffective assistance of counsel.

Former Assistant State's Attorney Michael Kelly testified that Lockett gave him no exculpatory information during his interviews with her prior to the trial. She did not tell him that defendant's complexion was not as dark as that of the gunman. She did not tell Kelly that she recognized the gunman from her neighborhood. Kelly did not suggest to Lockett in any way how she should testify. Lockett told him that she had been threatened and he relayed that information to Panarese. On cross-examination, Kelly testified that he did not recall asking Lockett if she had any evidence that would tend to show defendant's innocence. The circuit court sustained the State's objections to questions asking whether Kelly had a "drill" for interviewing witnesses and whether it would have been customary to ask Lockett if she had evidence that would tend to show defendant's innocence. Objections were also sustained to post-conviction counsel's asking questions of Kelly as to whether (1) he asked police witnesses in defendant's case if they had any evidence tending to show defendant's innocence, (2) it

was Kelly's practice to do so, and (3) it was part of the office policy of the State's Attorney to ask police officers if they had any exculpatory evidence. Objections were also sustained to post-conviction counsel's questions as to whether Kelly would have told Panarese if Lockett had told Kelly that defendant's complexion was not as dark as that of the gunman.

Defendant filed a petition for post-judgment relief under section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 2000)) in which he alleged that on November 5, 1999, post-conviction counsel discovered new evidence that John Hynes, a prosecutor at defendant's trial and now an associate judge, had a record of bias in jury selection stemming from two cases Hynes tried prior to defendant's case. Defendant's source for this newly discovered evidence was an article appearing in the Chicago Tribune. That article noted Hynes had failed to reveal on his application for Cook County associate judge two appellate court decisions reversing defendants' convictions due to violations of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), by the prosecution. Defendant alleged that Hynes was one of the prosecutors in both cases. One of the appellate decisions mentions Hynes in a quotation. The other decision does not mention Hynes by name. In his petition, defendant alleged that this newly discovered evidence was admissible to show Hynes' *modus operandi*, motive, intent, identification, or absence of mistake. At defendant's trial, the prosecution used 13 peremptory challenges, 6 against white venirepersons, 6 against black venirepersons, and one against an Asian female. The petition alleged that the personal characteristics of three black females and the Asian female who were excluded from the jury were indistinguishable from those of five white females who served on the jury and two white females who served as alternates. The jury ultimately

consisted of 10 Caucasians and 2 black males. The petition requested (1) vacatur of defendant's convictions and death sentence, (2) a hearing on his claims, (3) leave to amend or supplement the post-conviction petition to add additional claims, and (4) transcripts of jury selection and *Batson* hearings in the two cases mentioned in the newspaper articles.

The State filed a motion to dismiss the section 2—1401 petition. At the hearing on the State's motion, the State argued that the petition was untimely where defendant's trial was concluded in 1990, the petition was filed in 1999, and defendant had alleged no grounds to toll the two-year statute of limitations of section 2—1401. The State also argued that the purpose of section 2—1401 is to allow a party to raise factual matters that were unknown to the court at the time of the judgment that, had they been known, would have prevented rendition of the judgment and that an alleged *Batson* violation is not a valid basis for a section 2—1401 petition. Defendant argued that the circuit court could consider the *Batson* issue as a *Brady* matter. The circuit court granted the State's motion to dismiss. Following the conclusion of the evidentiary hearing, post-conviction counsel filed a motion asking the circuit court to reconsider its rulings as to the scope of the evidentiary hearing to include the allegations against Maslanka and the alleged *Batson* violations by former prosecutor Hynes. In the prayer of his motion, counsel requested leave to amend defendant's post-conviction petition to include an allegation that the State had committed *Brady* violations, thus depriving defendant of his right to due process and a fundamentally fair trial. The circuit court found that no *Brady* violations had occurred and denied the motion. After hearing arguments of counsel, the circuit court denied defendant's post-conviction petition, stating that it had considered the testimony of the witnesses and that Lock-

ett's testimony was not credible, noting that her "memory and manner while testifying here was poor."

## ANALYSIS

### I. Post-Conviction Petition

The Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 2000)) provides a remedy whereby defendants may challenge their convictions or sentences for violations of federal or state constitutional law. *People v. Towns*, 182 Ill. 2d 491, 502 (1998); *People v. Tenner*, 175 Ill. 2d 372, 377 (1997). A post-conviction action is a collateral proceeding and not an appeal from the underlying judgment. *People v. Williams*, 186 Ill. 2d 55, 62 (1999). The purpose of the proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal. *People v. Griffin*, 178 Ill. 2d 65, 72-73 (1997); *People v. Mahaffey*, 165 Ill. 2d 445, 452 (1995). Thus, *res judicata* bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered waived. *Towns*, 182 Ill. 2d at 502-03.

At an evidentiary hearing, the burden is on the defendant to make a substantial showing of a deprivation of constitutional rights and the circuit court's decision will not be disturbed unless it is manifestly erroneous. *People v. Childress*, 191 Ill. 2d 168, 174 (2000); *People v. Griffin*, 109 Ill. 2d 293, 303 (1985). The term "manifest error" means error that is "clearly evident, plain, and indisputable." *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997).

### A. *Scope of Evidentiary Hearing*

Defendant argues that he was denied his right to due process by the circuit court's failure to afford him a full and fair evidentiary hearing on his postconviction petition. He argues that his cross-examination of the State's

witnesses was improperly limited by the court. He also argues that the circuit court erred in refusing post-conviction counsel's requests for discovery.

### Detective Maslanka

Defendant argues that the circuit court abused its discretion by not reopening cross-examination of Maslanka to allow post-conviction counsel to question him about allegations of misconduct in other cases. Defendant claims that the evidence of the alleged misconduct was admissible to show that Maslanka's *modus operandi* was to use whatever means were necessary to convict his victims, including "torture, suggestive lineups, false police reports, and perjury."

We note that the circuit court has wide discretion to limit the type of evidence it will admit at a post-conviction evidentiary hearing. *People v. Montgomery*, 162 Ill. 2d 109, 113 (1994). A criminal defendant has a fundamental constitutional right to confront the witnesses against him and this includes the right to conduct a reasonable cross-examination. The defendant has the right to inquire into a witness' bias, interest, or motive to testify falsely. *People v. Davis*, 185 Ill. 2d 317, 337 (1998). The evidence used to impeach, however, must give rise to an inference that the witness has something to gain or lose by his testimony. Accordingly, the evidence must not be remote or uncertain. *People v. Bull*, 185 Ill. 2d 179, 206 (1998).

In *People v. Davis*, 193 Ill. App. 3d 1001 (1990), a police officer kicked defendant in the groin in what the officer said was an attempt to protect himself from defendant, who was resisting the officer's attempt to arrest him. At trial, the defendant attempted to cross-examine the officer concerning one prior and one pending civil rights suit alleging that the officer used excessive force in making an arrest. The officer had received no suspension or reprimand from the police department.

The circuit court sustained the State's objection to this questioning because there had been no disciplinary action taken against the officer in the suit that had been settled and the pending suit was not related to the defendant's case. *Davis*, 193 Ill. App. 3d at 1003. On appeal, defendant argued that the circuit court erred in restricting his cross-examination of the officer, noting that he had a constitutional right to impeach the officer on the issues of bias or motive to testify falsely. The appellate court noted that evidence showing bias must be direct and positive, not remote or uncertain. The court observed that the officer had not been suspended or reprimanded regarding the allegations in the two civil suits. Mere evidence of a civil suit against an officer charging some breach of duty unrelated to the defendant's case is not admissible to impeach the officer. *Davis*, 193 Ill. App. 3d at 1005.

In another case, *People v. Cameron*, 189 Ill. App. 3d 998 (1989), the defendant sought to use a pending civil suit against a police officer to impeach the officer's testimony. In the civil suit, the plaintiff had accused the officer of misidentifying him as the person who had delivered a controlled substance to a confidential informant. The defendant contended that the pendency of the suit showed bias on the officer's part to gain favor from the State by testifying favorably to it. *Cameron*, 189 Ill. App. 3d at 1002. The appellate court noted that, while it has been held to be error to refuse a defendant's request to impeach a State's witness with evidence of pending but unproved criminal charges to show bias, no case had held the same regarding the mere pendency of a civil suit against a law enforcement officer charging misconduct unrelated to the defendant's case. The court found that any alleged incentive on the officer's part to give favorable testimony because of the pending civil suit was remote and uncertain. Likewise, evidence of the suit

would be inadmissible to show the officer's propensity to perjure himself. Only convictions may be used to impeach a witness; evidence of the actual commission of the offense is inadmissible. *Cameron*, 189 Ill. App. 3d at 1002-03.

The impeachment material sought to be used in *Davis* and *Cameron* is similar to that which defendant proposed to use here in cross-examining Maslanka. In contrast, defendant cites cases that we conclude are distinguishable from his case. In *People v. Phillips*, 95 Ill. App. 3d 1013 (1981), the defendant was charged with attempted murder and other offenses against an off-duty police officer. The defendant contended that he shot the officer because the officer was brandishing his weapon at the defendant's brother and the defendant feared that the officer would shoot. Evidence at the trial showed that the officer was intoxicated. The circuit court denied the defendant's request to cross-examine the officer about his 15 prior suspensions from the police department. The defendant had argued that this was relevant to whether the officer was justified in displaying his weapon and whether the officer's account of the shooting was true. *Phillips*, 95 Ill. App. 3d at 1019. The appellate court reversed and remanded for a new trial, finding error in the refusal to allow the defendant to question the officer about his prior suspensions. The court rejected the State's argument that evidence of the suspensions was remote and unrelated to the defendant. The court noted that the officer could have been motivated by a desire to avoid another suspension or possibly termination. Also, given the officer's severe injuries, he could have been motivated to testify falsely to retain his medical insurance coverage and compensation. *Phillips*, 95 Ill. App. 3d at 1021.

Defendant also relies on *People v. Robinson*, 56 Ill. App. 3d 832 (1977), in which the defendant was convicted

of striking a police officer. The circuit court denied the defendant's request to cross-examine the officer concerning evidence that the FBI was investigating charges that the officer frequently used excessive force, especially against black persons. The defendant also wished to question the officer about evidence of specific instances in which the officer had allegedly employed excessive force and evidence that during the previous year, the officer had been suspended by the police department for conduct unbecoming an officer. *Robinson*, 56 Ill. App. 3d at 834. The appellate court rejected the defendant's argument concerning evidence of the FBI's investigation and of the officer's specific past violent acts. However, it held that the defendant should have been permitted to introduce evidence concerning the fact that the officer had been suspended from his duties at the time of trial for committing an act of violence and was scheduled to resume active duty a few days later. This fact may have given the officer a motive to testify falsely to avoid further suspension or other disciplinary measures. The court held, however, that the error was harmless. *Robinson*, 56 Ill. App. 3d at 840.

Finally, defendant cites *People v. Adams*, 259 Ill. App. 3d 995 (1993), in which the defendant was convicted of possession of a controlled substance. The circuit court denied defendant's request to cross-examine a police officer who had given an affidavit for a search warrant based upon information received from a confidential informant. The defendant contended that the officer had perjured himself in his affidavit. The defendant was barred from questioning the officer about any action by the police department against him, any lawsuit currently pending in federal court, or any drug testing he completed approximately one month after the defendant's arrest. The officer had tested positive for the presence of cocaine and amphetamines. He was suspended from the police

force at the time of the trial. *Adams*, 259 Ill. App. 3d at 1000-01. The appellate court reversed and remanded for a new trial. The court held that the defendant should have been allowed to question the officer concerning his illegal drug use, his suspension from the police department, and the pending civil suit against him. The court noted that it is well established in Illinois that drug addiction has an important bearing upon the credibility of a witness and that evidence that the officer was presently suspended from the police department may provide him with a motive to testify falsely to avoid further disciplinary action. *Adams*, 259 Ill. App. 3d at 1004.

The relevance of the proposed cross-examination of the police officers involved in *Phillips*, *Robinson*, and *Adams* contrasts sharply with defendant's desired cross-examination of Maslanka. In this case, the complaints against Maslanka and the lawsuits naming him as a defendant did not provide any inference that Maslanka had a motive to testify favorably to the State or to perjure himself at the evidentiary hearing. Defendant has not alleged that Maslanka physically abused him in any manner. Maslanka's only duty was to conduct the lineup for Lockett. The civil suits defendant wishes to explore do not concern Maslanka's actions in conducting lineups. Likewise, the affidavits submitted by Raymond Mack, Donald Torrence, and Tyrone Burnett, which alleged misconduct on Maslanka's part, are not relevant to Maslanka's credibility. Only Mack alleged that Maslanka had placed him in a suggestive lineup by forcing him to put on sunglasses and a cap. Mack stated that after doing so, he did not look like anyone else in the lineup. Mack's situation is different from the one before us, where Maslanka placed sunglasses on all the men in the lineup and only defendant refused to put them on. We hold, therefore, that the circuit court did not abuse its discretion in refusing to reopen Maslanka's cross-

examination so that defendant could question him about these irrelevant matters.

### Trial Counsel Panarese

Defendant argues that the circuit court erred in refusing to allow him to cross-examine Panarese as to (1) the reduction in his bill for services rendered at the trial, (2) his failure to bill for or make any note of his alleged attempts to call Lockett prior to trial, or (3) whether any court had found that Panarese provided ineffective assistance of counsel. In making his argument, defendant relies on the same three cases (*Phillips*, *Robinson*, and *Adams*) he cited regarding the circuit court's refusal to reopen Maslanka's cross-examination. These cases are inapplicable. The matters that the defendants in those cases sought to raise were directly relevant to the issues in those cases. Here, defendant has failed to show how the reduction in Panarese's bill for his trial work had anything to do with the issue of whether Panarese failed to interview Lockett. It is not unusual for a trial court to reduce a fee request made by appointed counsel. The fact that the trial judge in defendant's case reduced Panarese's bill has no relevance to the issues raised at the evidentiary hearing. Similarly, the fact that Panarese failed to bill for or make a note of his alleged attempts to contact Lockett does not give rise to an inference that Panarese testified falsely that he tried but was unable to contact Lockett. It must be noted that Lockett testified at the evidentiary hearing that she could not remember talking to anyone except Kelly, the then assistant State's Attorney who was handling the case. Lockett did not testify that she did not talk to Panarese, only that she could not remember talking to him. Further, postconviction counsel did, in fact, question Panarese about the reduction of his fee and his failure to charge for unsuccessful telephone calls and Panarese answered these questions. Trial courts have discretion to restrict

cross-examination that is repetitive or unduly harassing. *People v. Prevo*, 302 Ill. App. 3d 1038, 1048 (1999).

As to defendant's complaint that the circuit court should have allowed him to question Panarese regarding any prior findings of ineffectiveness, this was a collateral matter having no relevance to the issues at the evidentiary hearing. We fail to see how such evidence would give rise to an inference that Panarese was ineffective in this case. To establish ineffectiveness of counsel, defendant must meet the *Strickland* standard, *i.e.*, he must show that counsel's representation fell below an objective standard of reasonableness and that defendant was prejudiced thereby. See *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068 (1984). Defendant failed to meet this standard. We also reject defendant's argument that had he been allowed to question Panarese on these matters, Panarese would have been discredited and Lockett's credibility increased. Lockett did not testify unequivocally that she did not talk to Panarese or his investigators. She testified that she may have talked to others, in addition to Kelly. Lockett's credibility would not have been enhanced had post-conviction counsel been allowed to delve into these collateral matters.

### Assistant State's Attorney Kelly

Defendant argues that the circuit court improperly restricted his cross-examination of Kelly as to (1) whether Kelly considered it exculpatory that Lockett could not positively identify defendant as the perpetrator, (2) whether there was a policy in the State's Attorney's office to ask witnesses if they had evidence that would be exculpatory, and whether Kelly himself had such a policy, and (3) Kelly's understanding of his obligation under United States Supreme Court cases and our Rule 412 (188 Ill. 2d R. 412). Defendant contends that, had he been allowed to question Kelly on these matters, Kelly's

credibility would have been discredited and Lockett's credibility enhanced. We disagree.

In *Brady*, the Supreme Court held that the prosecution is required to turn over to the defense upon request any evidence that is favorable to the accused and a failure to do so results in a denial of due process where the evidence is material to guilt or to punishment. In *United States v. Agurs*, 427 U.S. 97, 107, 49 L. Ed. 2d 342, 351, 96 S. Ct. 2392, 2399 (1976), the Court held that the duty to disclose applies even where there has been no request for exculpatory evidence. In *United States v. Bagley*, 473 U.S. 667, 676, 87 L. Ed. 2d 481, 490, 105 S. Ct. 3375, 3380 (1985), the Court held that the duty to disclose includes impeachment evidence as well as exculpatory evidence. *Brady* also applies to exculpatory information known only to the police and not to the prosecutor. *Kyles v. Whitley*, 514 U.S. 419, 433-34, 131 L. Ed. 2d 490, 505, 115 S. Ct. 1555, 1566 (1995). The *Brady* rule also requires the individual prosecutor to learn of any favorable evidence known to others acting on behalf of the government in the case. *Kyles*, 514 U.S. at 437, 131 L. Ed. 2d at 508, 115 S. Ct. at 1567. Evidence is material if a reasonable probability exists that, had the evidence been disclosed, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682, 87 L. Ed. 2d at 494, 105 S. Ct. at 3383.

Rule 412 governs the disclosure of information by the prosecution to the defense. Under Rule 412(f), the prosecution must ensure a free flow of information between investigative personnel and its office sufficient to place within its possession all information relevant to the accused and the offense charged. 188 Ill. 2d R. 412(f). Defendant contends that Kelly had an obligation to look for exculpatory evidence and that Kelly's understanding of his obligations under *Brady* and Rule 412 went to the heart of defendant's post-conviction case. However,

defendant fails to explain how his proposed questioning of Kelly would have been relevant to the issue of Lockett's credibility at the evidentiary hearing. Lockett did not testify that she gave any exculpatory evidence to Kelly. Kelly testified that Lockett's interviews were consistent with the information in the police reports. Lockett told both the police and Kelly that the man she identified in the lineup had the same height, build, and color as the perpetrator. Defendant asserts that further questioning of Kelly would have discredited him and tended to show that a *Brady* violation occurred. This statement is baseless. Nothing in the record remotely suggests that the prosecution committed a *Brady* violation. Defendant's attempts to question Kelly on these collateral matters were properly rebuffed by the circuit court.

## Discovery Rulings

Defendant argues that the circuit court erred in denying his motions for discovery regarding Maslanka's alleged misconduct in other cases, ineffective-assistance claims against Panarese, and *Brady* violations by the trial prosecutors.

"The discovery rules for neither civil nor criminal cases apply to proceedings under the Post-Conviction Hearing Act. [Citation.] Nonetheless, the circuit court has inherent discretionary authority to order discovery in post-conviction proceedings. [Citation.] Circuit courts, however, must exercise this authority with caution because post-conviction proceedings afford only limited review of constitutional claims not presented at trial, and there is a potential for abuse of the discovery process in post-conviction proceedings. [Citation.] As a result, the circuit court should allow discovery only after the moving party demonstrates 'good cause' for a discovery request. [Citation.] We will not disturb a circuit court's denial of a request for discovery in post-conviction proceedings absent an abuse of discretion."
*People v. Fair*, 193 Ill. 2d 256, 264-65 (2000).

Defendant argues that he demonstrated good cause with the evidence showing Maslanka's misconduct, Panarese's padding of his bill, and evidence that Kelly did not understand his *Brady* and Rule 412 obligations. However, we have already held that this allegedly impeaching material was irrelevant and collateral to the issue of Lockett's credibility. Accordingly, this evidence did not provide good cause for further discovery.

### B. *Alleged Brady Violation*

Defendant complains that the State did not turn over to his trial counsel the allegations against Maslanka in unrelated cases concerning torture, police report falsification, failure to follow established procedures, and lineup suggestiveness that existed at the time of the trial, or allegations that came to light after the trial concluded. In the prayer of his motion to reconsider the scope of the evidentiary hearing, defendant sought leave to amend his post-conviction petition to include a claim that the State committed a *Brady* violation in failing to reveal the allegations regarding Maslanka. In denying the motion, the circuit court ruled that no *Brady* violation had occurred.

Defendant repeats the same argument on this issue that he made earlier regarding the impeachment value of this material. As we have already held, the evidence concerning these allegations was irrelevant and collateral to the issues identified by this court in its remand for an evidentiary hearing. Questioning Maslanka at trial or at the evidentiary hearing concerning these allegations would not have tended to impeach his testimony about the lineup he conducted for Lockett. Most of the allegations involved alleged physical abuse of suspects in custody. Defendant has never alleged that he was mistreated by Maslanka. Although Raymond Mack alleges in his affidavit that Maslanka put him in a suggestive lineup where he was the only person forced to wear

sunglasses and a cap, in the instant case all the men in the lineup were asked to put sunglasses on, because Lockett told the police that the man she saw leaving the scene of the shooting wore sunglasses. All the men complied with the request except defendant. Thus, any suggestiveness that may have infected the lineup was not due to Maslanka, but to defendant's refusal to put on the sunglasses. A *Brady* violation occurs only where the evidence is material to guilt or to punishment. Materiality is shown where a reasonable probability exists that, had the evidence been disclosed, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682, 87 L. Ed. 2d at 494, 105 S. Ct. at 3383. As the allegations against Maslanka were irrelevant to any issue involved in defendant's case, the State had no duty to reveal any of this information. We therefore conclude that the circuit court did not err in denying defendant's motion.

## II. Section 2—1401 Petition

Although a section 2—1401 petition is usually characterized as a civil remedy, it may also be used in criminal cases. *People v. Haynes*, 192 Ill. 2d 437, 460-61 (2000). Section 2—1401 provides a statutory procedure permitting vacatur of final judgments and orders after 30 days from their entry. 735 ILCS 5/2—1401(a) (West 1998). A proceeding under section 2—1401 is a forum in which " 'to correct all errors of fact occurring in the prosecution of a cause, unknown to the petitioner and court at the time of trial, which, if then known, would have prevented the judgment.' " *People v. Berland*, 74 Ill. 2d 286, 314 (1978), quoting *Ephraim v. People*, 13 Ill. 2d 456, 458 (1958) (construing section 72 of the former Civil Practice Act (Ill. Rev. Stat. 1981, ch. 110, par. 72)). The petition must be filed within two years following entry of the challenged judgment, unless the petitioner makes a clear showing that he was under a legal disability or duress or the grounds of relief were concealed. *People v.*

*Caballero*, 179 Ill. 2d 205, 210-11 (1997); 735 ILCS 5/2—1401(c) (West 1998). To be entitled to relief under section 2—1401, a petitioner must set forth allegations supporting: (1) the existence of a meritorious claim or defense; (2) due diligence in presenting the claim or defense to the circuit court in the original action; and (3) due diligence in filing the section 2—1401 petition for relief. *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 220-21 (1986); *Mt. Zion State Bank & Trust v. Weaver*, 226 Ill. App. 3d 783, 785 (1992). When reviewing a circuit court's ruling on a section 2—1401 petition in a criminal case, the appropriate standard of review is whether the circuit court abused its discretion. *Haynes*, 192 Ill. 2d at 461.

After the evidentiary hearing began, defendant filed a section 2—1401 petition, alleging newly discovered evidence supporting a claim under *Batson*. Defendant claimed that he discovered, through an article in the Chicago Tribune, that the appellate court, in two separate cases, found *Batson* violations involving former Assistant State's Attorney John Hynes, one of the prosecutors at defendant's trial. In one of these cases, *People v. Walls*, 220 Ill. App. 3d 564 (1991), the defendant alleged *Batson* violations involving four black venirepersons. Prosecutors had used peremptory challenges on a total of six persons, four of whom were black. The appellate court found that the prosecutors' explanations for these challenges were pretextual. *Walls*, 220 Ill. App. 3d at 574. Hynes' name is mentioned in a quote once in the appellate court decision. *Walls*, 220 Ill. App. 3d at 572. In the second case, *People v. Morales*, 308 Ill. App. 3d 162 (1999), the State exercised 9 of its 16 peremptory challenges against minority venirepersons. On appeal after remand, the defendant challenged seven of the State's peremptory challenges as violating *Batson*. The appellate court reversed and remanded for a new trial, finding that two of the seven challenges were *Batson* violations. *Mo-*

*rales*, 308 Ill. App. 3d at 178-79. There is no mention of Hynes in the appellate court's reported decision. Defendant contends that Hynes failed to disclose these reported decisions in his application for an associate judgeship.

On appeal, defendant argues that he is entitled to a *Batson* hearing. He argues that the personal characteristics of the five black women and the Asian woman stricken from the jury by the State's use of its peremptory challenges were "indistinguishable" from those of the five white women who served on the jury and the two white women who served as alternates. Defendant further argues that this fact raised an inference that the State used its peremptory challenges to exclude the black and Asian venirepersons on the basis of their race and gender. We note that defendant's trial counsel did not raise a *Batson* objection to the State's use of its peremptory challenges. Appellate counsel did not raise the issue of ineffectiveness of trial counsel in the direct appeal. Although post-conviction counsel raised the issue, that claim was not pursued on appeal from the dismissal of the post-conviction petition.

Defendant argues that Hynes' failure to disclose the *Walls* and *Morales* decisions on his judicial application constituted fraudulent concealment, thus tolling the two-year statute of limitations of section 2—1401. To make a successful showing of fraudulent concealment, the defendant must "allege facts demonstrating that his opponent affirmatively attempted to prevent the discovery of the purported grounds for relief and must offer factual allegations demonstrating his good faith and reasonable diligence in trying to uncover such matters before trial or within the limitations period." *People v. McLaughlin*, 324 Ill. App. 3d 909, 918 (2001). It is well established that fraudulent concealment sufficient to toll the two-year limitation period of the statute requires "affirmative acts or representations designed to prevent discovery

of the cause of action or ground for relief." *Crowell v. Bilandic*, 81 Ill. 2d 422, 428 (1980) (construing section 72 of the former Civil Practice Act).

In his section 2—1401 petition, defendant alleged that he could not have discovered the *Walls* and *Morales* decisions earlier, because Hynes' name was not mentioned in either published opinion. However, Hynes' name is in fact mentioned in a quote in *Walls* which identifies him as one of the prosecutors in that case. Defendant was sentenced in 1990. The *Walls* decision was published a year later. Defendant offers no reason why this decision could not have been discovered within the two-year limitations period of section 2—1401. The alleged concealment took place nine years after defendant was tried, convicted, and sentenced. It cannot be said that Hynes was attempting to conceal anything from defendant at that point.

In his reply brief, defendant argues that even if Hynes engaged in no affirmative acts to conceal his role in the two appellate opinions, an exception to this requirement exists where a fiduciary relationship is clearly established. See *Crowell*, 81 Ill. 2d at 428. Defendant asserts that Hynes, as a prosecutor, had a fiduciary duty to disclose his involvement in the *Walls* and *Morales* cases. We need not address this argument, because defendant's section 2—1401 petition did not allege the existence of a fiduciary relationship between himself and Hynes. A petition under section 2—1401 will not be considered if it is filed more than two years following entry of the judgment, unless the petitioner makes a *clear showing* of legal disability, duress, or that the grounds for relief were concealed. *Caballero*, 179 Ill. 2d at 210-11. Defendant has failed to make such a showing here. Thus, we conclude that the circuit court did not err in dismissing defendant's section 2—1401 petition.

## CONCLUSION

Accordingly, we affirm the circuit court's judgment

denying defendant's post-conviction petition and its judgment dismissing defendant's section 2—1401 petition. The clerk of this court is directed to enter an order setting Wednesday, January 15, 2003, as the date on which the sentence of death entered in the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 2000)). The clerk of this court shall send a certified copy of the mandate to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

JUSTICE RARICK took no part in the consideration or decision of this case.

JUSTICE KILBRIDE, dissenting:

For the reasons set forth in my dissents in *People v. Hickey*, 204 Ill. 2d 585, 636-40 (2001) (Kilbride, J., dissenting), and *People v. Simpson*, 204 Ill. 2d 536, 581-85 (2001) (Kilbride, J., dissenting), I believe that defendant's convictions and sentence should be set aside because the trial proceedings were not conducted in accordance with the new supreme court rules governing capital cases. As I stated in my dissents, the procedures in capital cases prior to this court's adoption of the new rules were inherently unreliable and did not sufficiently protect a defendant's constitutional rights. For this reason, the new rules should be applied retroactively. See *People v. Caballero*, 179 Ill. 2d 205, 220-21 (1997). Therefore, I respectfully dissent.