# In the
# United States Court of Appeals
# For the Seventh Circuit

No. 14-2946

ARTHUR MITCHELL,

*Petitioner-Appellant*,

*v.*

DONALD ENLOE, Warden,

*Respondent-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:10-cv-03034 — **Robert M. Dow**, *Judge*.

ARGUED FEBRUARY 17, 2016 — DECIDED MARCH 24, 2016

Before BAUER, FLAUM, and WILLIAMS, *Circuit Judges*.

FLAUM, *Circuit Judge*. Petitioner Arthur Mitchell admitted to killing Ricky Neal on February 5, 1995 by striking him with a brick. The killing arose out of a dispute when Neal was working on Mitchell's car in the backyard of Neal's home.

Mitchell asserted that he acted in self-defense after Neal attacked him with a wrench. The prosecution presented forensic evidence that refuted Mitchell's claim of self-defense.

Following a trial in the Illinois Circuit Court, the jury convicted Mitchell of first degree murder. The circuit court sentenced him to fifty-seven years in prison. Mitchell now seeks habeas relief alleging ineffective assistance of counsel and a due process violation. We affirm the district court's denial of Mitchell's request for habeas relief.

## I. Background

### A. State's Case-in-Chief

An autopsy of Neal revealed evidence of blunt force trauma to his face and the back of his head. There were abrasions on his forehead and nose, bruising to his forehead, a two-inch laceration over his right eye, and a bone fracture beneath his eyebrow. Neal also suffered two wounds to the back of his head: a laceration behind his left ear and a linear laceration down the center of his scalp. Foreign debris was recovered only from Neal's face. Debris was not found in his hair or on the back of his head. A post-mortem toxicology report revealed that Neal had been using alcohol and cocaine.

A forensic pathologist for the State, Dr. Larry Blum, testified that blunt force trauma to Neal's head caused his death. He said that Neal died from "a beating" that included "two separate blows" to the back of his head. According to Dr. Blum, unless Neal fell onto a large rock, the laceration on his scalp was not consistent with a fall backwards from a standing position onto a gravel surface, nor could both lacerations have resulted from such a fall.

At trial, Sheila Mitchell (a distant relative of petitioner Mitchell), the State's sole eyewitness, testified to events surrounding Neal's death.[1] Sheila was serving a sentence for a felony conviction at the time of trial. Sheila testified that she did not "make any deal with the State to testify" against Mitchell. She also stated that for ten years she had been receiving disability payments for physical and mental disabilities.

Sheila testified that she consumed substantial amounts of alcohol and crack cocaine the night before and on the morning of Neal's murder. She said that when she arrived at Neal's house, she continued to drink alcohol and smoke crack with another woman, Jeanine Tanner, and Neal. Sheila further testified that Neal raised the front of Mitchell's vehicle using a car jack and began to work. Meanwhile, Sheila said she and Tanner continued to drink and smoke crack inside the car, sleeping intermittently.

Sheila testified that she heard Neal say that he had dropped something into the motor and that Mitchell and Neal were arguing. Sheila said that, at this point, she was slumped down in the seat, trying to sleep. She further testified that Tanner then shook her and twice uttered a profane exclamation. Sheila said she sat up and saw Mitchell run behind the garage and retrieve a brick; she then slumped back down. She testified that she heard Neal say, "Man, why do you want to do this," and looked up to see Mitchell with a brick in his hand. Sheila said she could not see Neal's hands because Neal was standing with his back to her. She stated that Mitchell raised

---

[1] Sheila Mitchell died on February 2, 2006.

his arm and made a motion like he was going to throw a football. Sheila said she did not believe Mitchell would hit Neal, so she slumped back down in the seat. She then "heard the fall" against the passenger door and, when she raised her head, saw Mitchell holding the brick. Although Sheila testified that she did not see the brick hit Neal, she saw Mitchell bring the brick down toward the ground twice.

Sheila testified that she did not see Neal swing a wrench at Mitchell at any point. Sheila further testified that when she emerged from the car, she saw Neal lying face down "on the ground with blood gushing out of the back of his head."

### B. Mitchell's Defense

At trial, Mitchell attempted to discredit Sheila's version of events and show that he killed Neal in self-defense after Neal attacked him with a wrench. Mitchell testified that while he was driving Sheila, Tanner, and Neal to Neal's house, Neal smoked crack and Mitchell warned Neal not to smoke while he worked on Mitchell's car. Mitchell stated that once they were at Neal's house, Mitchell opened the hood of the car while Neal remained inside the car with Sheila and Tanner.

Mitchell testified that Sheila and Tanner stayed in the car, drinking, smoking, and sleeping. Mitchell further testified that Neal also smoked crack and drank a beer. Mitchell said he again warned Neal not to do drugs while working on the car, but that Neal continued to smoke. According to Mitchell, he then told Neal to put the car back together and said that he would pay Neal for the work completed thus far. Mitchell testified that, after telling Neal to stop working, Neal told Mitch-

ell that he had dropped a piece of the ratchet set into the engine. Mitchell said that Neal then hoisted up the car using a jack to change the oil.

According to Mitchell, as Mitchell was looking under the car for the missing piece, Neal moved toward the car jack and Mitchell believed that Neal was going to drop the car on him. Mitchell said that he stood up, again told Neal to stop working on the car, and said that he would "put it [back] together [himself]." Mitchell testified that he offered to pay Neal half of what he owed him for the whole job. Mitchell further testified that he then reached for the wrench in Neal's hand so that he could put the car back together but that Neal would not relinquish it. Mitchell said that when he gave Neal the money, Neal "got highly upset" and threw it on the ground.

Mitchell testified that he bent down to pick up the money and, when he looked up, he saw Neal "coming down on [him] with th[e] wrench." Mitchell said Neal struck his arm and finger. Mitchell testified that he fell to the ground, grabbed two bricks from nearby, then stood up with one of the bricks in his hand and hit Neal on the left side of the face. According to Mitchell, at this point Neal stood directly in front of Mitchell, wrench in hand. Mitchell stated that he then threw aside the brick and knew from the blood and sweat dripping down Neal's forehead that Neal's head was "busted."

As explained by Mitchell, Neal then "swung the wrench again," nicking Mitchell's nose. Mitchell testified that he grabbed the other brick and stepped back to "counterpunch" Neal. Mitchell said he slipped on his coat and "just threw the brick and the brick went flying" out of his hand toward Neal. He stated that as he fell, he saw Neal "go down like he was ducking." Mitchell testified that he did not know if the brick

actually hit Neal, but that it "had to [have] hit him in the back of his head because [Neal] fell." He said he next saw Neal "standing straight up in the air," then fall straight back "like a tree" onto the "pointy rocks and everything else" on the ground. Mitchell said that he immediately removed the wrench from Neal's hand.

At trial, Mitchell explained that he hit Neal to protect himself. He stated that he would not have hit Neal with the bricks if Neal had not swung the wrench at him. Mitchell also testified that his left index finger was swollen from being struck by the wrench, prompting the police to photograph his hands.

On cross-examination, Mitchell testified that he was not "upset" with Neal, but "wanted to just end it all, put [the car] back together" and leave because he "was tired." On redirect examination, Mitchell denied being "upset enough at … Neal smoking cocaine to take a brick and hit him with it." Rather, he said he "hit Ricky Neal with the brick and in my own self-defense. I just wanted to leave."

The State challenged Mitchell's testimony that Neal hit him with a wrench. Following Mitchell's testimony, the State offered testimony from Detective Richard Demick, who interviewed Mitchell on the day after Neal's death. Detective Demick testified that he saw no bruises or marks on Mitchell at the interview. To refute this testimony, Mitchell introduced the testimony of investigator Jeffrey Beasley, who said he saw Mitchell three days after Neal's death and observed that Mitchell's left index finger was swollen above the knuckle.

### C. Jury Instructions

At the jury instruction conference, the Illinois Circuit Court explained the lesser included offense of second degree

murder instruction to Mitchell. The prepared instruction the court read to Mitchell was for unreasonable belief in the necessity of self-defense, one of two second degree murder instructions in the then-current Illinois Pattern Jury Instructions, Criminal (3d ed. 1992). The pattern instructions also allowed for a second degree murder instruction based on provocation.

Mitchell told the circuit court that he did not want the instruction because he did not "like the way that sounds" and asked if "there is anything else worded out that is trying to find me guilty[?]" The court responded, "this is the instruction the law says that you must give if you want to take the chance of getting a second degree conviction." Mitchell asked two more times if "that's the only way it's worded" and the court responded "[t]hat's it." The record does not reflect that the court advised Mitchell of the possibility of an instruction based on provocation. Mitchell declined to request a second degree murder instruction, stating that he would "rather go for everything than nothing."

Following recess and discussion with counsel, Mitchell changed his mind and agreed to an instruction on unreasonable belief in the necessity of self-defense.[2] Mitchell's counsel did not request the alternative provocation instruction. During closing arguments, Mitchell's counsel stated: "Self-defense. That's the case… . My client acted in self-defense, using

---

[2] The circuit court instructed the jury that it could find Mitchell guilty of second degree murder if he, "at the time he performed the acts which caused the death of Ricky Neal, believed the circumstances to be such that they justified the deadly force he used, but his belief that such circumstances existed was unreasonable."

just as much force as was being used on him to protect himself." The jury rejected Mitchell's claim of self-defense and convicted him of first degree murder. The court sentenced him to fifty-seven years in prison.

### D. Post-Trial Proceedings

Mitchell filed a direct appeal in the Illinois Appellate Court. In 1997, the Illinois Appellate Court affirmed his conviction. Mitchell's petition for leave to appeal was then denied by the Illinois Supreme Court on June 3, 1998.

Mitchell filed a pro se post-conviction petition in Illinois state court, which he amended several times. In September 2002, Mitchell and his then-post-conviction counsel, Eric Mitchell, interviewed Sheila. Eric Mitchell—who had been appointed to represent Mitchell in July 2000—withdrew as Mitchell's counsel in January 2004, explaining that he was "uncomfortable" with his interactions with Mitchell in court as well as Mitchell's "disturbing" statement regarding his knowledge of the location of counsel's father's residence.

In June 2006, during the pendency of the proceedings on his pro se post-conviction petition, Mitchell filed a combined petition for post-conviction relief and a petition for relief from judgment based on newly discovered evidence in the Illinois Circuit Court. Attached to the combined petition was an unsworn, unsigned affidavit dated 2003, which Mitchell alleged was the affidavit of Sheila Mitchell. In the affidavit, Sheila averred that when she was interviewed by the police regarding Neal's death, the police "momentarily turned off the video tape" and told her that she and Tanner could be charged with accessory to murder. She stated that the police informed her that if she testified against Mitchell they would

not charge her and "would make it light" on her. Also attached to the combined petition was an unsworn, unsigned affidavit dated 2006, which Mitchell alleged was the affidavit of Eric Mitchell. Eric asserted that Sheila made the above statements in his presence. In a supplement to the combined petition, Mitchell alleged that Eric Mitchell was ineffective for failing to move to appoint a stenographer to transcribe Sheila's "deposition" and for failing to get Sheila's signature before she died in 2006.

The circuit court denied Mitchell's petition and he appealed to the Illinois Appellate Court, arguing that his trial counsel was ineffective for failing to request a jury instruction on second degree murder based on provocation, and the circuit court erroneously denied Mitchell an evidentiary hearing on the claim in his combined petition that Sheila gave false testimony at trial when she denied making a deal with the State to testify against Mitchell. The Illinois Appellate Court affirmed the denial of his petition in 2009, with one justice dissenting.

In 2010, Mitchell filed a pro se 28 U.S.C. § 2254 habeas petition in the Northern District of Illinois, asserting twenty-nine claims. The district court appointed counsel to assist Mitchell. In September 2013, the district court denied Mitchell's request for habeas relief, declined to issue a certificate of appealability, and entered judgment. In October 2013, Mitchell timely filed a pro se motion to reconsider pursuant to Rule 59(e). The district court denied Mitchell's Rule 59(e) motion, finding that Mitchell failed to clearly establish that the district court manifestly erred in rejecting his habeas claims and denying a certificate of appealability. Mitchell appeals.

## II. Discussion

Mitchell presents two arguments on appeal to this Court. He asserts that he is entitled to habeas relief due to ineffective assistance of counsel and a due process violation. In a federal habeas proceeding, we review the district court's findings of fact for clear error and legal conclusions, including mixed questions of law and fact, de novo. *Harding v. Walls*, 300 F.3d 824, 827 (7th Cir. 2002). We may grant habeas relief if the adjudication by the Illinois Appellate Court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* (citing 28 U.S.C. § 2254(d)). Thus, to the extent the state court adjudicated Mitchell's claims on the merits, he must show that the state court decision was not just "incorrect or erroneous," but "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

### A. Ineffective Assistance of Counsel Claim

Mitchell's first argument on appeal is that he is entitled to habeas relief, or at least an evidentiary hearing, due to ineffective assistance of counsel. Mitchell contends that trial counsel's failure to request a jury instruction for second degree murder based on provocation violated his Sixth Amendment right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

Under *Strickland*, trial counsel renders ineffective assistance when counsel's performance falls below an objective standard of reasonableness and the petitioner is prejudiced by that performance. *Id.* at 687–88. Our case law establishes that where evidence at trial supports a lesser jury instruction, trial counsel may make a strategic decision not to request such instruction. *See, e.g.*, *United States* ex rel. *Barnard v. Lane*, 819 F.2d 798, 805 (7th Cir. 1987). *Strickland* generally provides a presumption of strategic decision-making by counsel. *Woolley v. Rednour*, 702 F.3d 411, 422–23 (7th Cir. 2012). However, that presumption does not extend to situations where there was "no strategic rationale underlying [the] errors." *Id.* at 423.

We therefore face two questions: First, whether Mitchell's trial counsel made a reasonable, strategic choice to omit the provocation instruction; and second, whether the evidence in the record indicates that the failure to give an instruction on provocation prejudiced Mitchell. Mitchell claims that the facts supported two second degree murder instructions, one for unreasonable belief in the necessity of self-defense and another for provocation. A provocation instruction under the Illinois Pattern Jury Instructions, Criminal, No. 7.03A (3d ed. 1992), would have read: "A mitigating factor exists so as to reduce the offense of first degree murder to the lesser offense of second-degree murder if, at the time of the killing, the defendant acts under a sudden and intense passion resulting from serious provocation by [the deceased]." According to Mitchell, the record suggests that trial counsel likely failed to consider giving the provocation instruction and should not have been afforded the presumption of "strategy."

The Illinois Appellate Court held that because a second degree murder conviction requires different mental states under theories of "unreasonable belief" and "provocation," trial counsel acted strategically by not requesting a provocation instruction. Likewise, the district court found that Mitchell had not set forth evidence to suggest that trial counsel's performance was deficient. The district court made this finding based on trial testimony that showed that Mitchell's counsel "clearly chose a self-defense theory" over a provocation theory. The district court emphasized that this "is not unreasonable and is the type of tactical choice a defense counsel often must make… . [T]rial counsel reasonably could have concluded that this alternative instruction—one at odds with his theory of the case—would only confuse the jury and undermine the strategy counsel had already adopted."[3]

We agree with the circuit and district courts that the evidence in the record cannot support both a provocation theory and self-defense theory. Mitchell testified at trial that he "wasn't upset" and "just wanted to leave." It would have been clearly inconsistent for counsel to present evidence that Mitchell was acting because of sudden and intense passion given this testimony. Thus, trial counsel acted reasonably by not presenting the provocation instruction. The district court and the Illinois Appellate Court correctly found that it would

---

[3] Furthermore, the district court concluded that Mitchell was not prejudiced by trial counsel's choice because the jury did not accept Mitchell's explanation for how Neal was killed. Because the jury did not believe Mitchell's story, the district court found it implausible that the jury would have embraced a provocation theory. Thus, Mitchell could not have won on a provocation theory, just as he failed to convince the jury that he acted in self-defense.

not have been proper—and likely would have confused the jury—to provide a second degree murder instruction based on provocation.

Mitchell also fails to show that he was prejudiced due to counsel's failure to request a provocation instruction. *See Smith v. McKee*, 598 F.3d 374, 388 (7th Cir. 2010) ("Prejudice means, 'an error which so infected the entire trial that the resulting conviction violates due process.'" (citation omitted)). To convict for second degree murder under either self-defense or provocation, the jury would have had to believe Mitchell's version of events. But the forensic evidence contradicts Mitchell's story. The jury took a view of the evidence that permitted conviction for first degree murder. It is unlikely that the jury would have disregarded that evidence and believed Mitchell's account even if counsel had presented an alternative provocation instruction.

In sum, because Mitchell did not show that his trial counsel acted unreasonably or that he was prejudiced by counsel's decision, the district court properly dismissed Mitchell's claim of ineffective assistance of counsel.

**B. Due Process Claim**

Mitchell's second argument is based on Sheila's unsworn, unsigned affidavit, which avers that the State offered not to charge her as an accessory to murder in exchange for her testimony against Mitchell. Mitchell asks this Court to grant an evidentiary hearing to prove the validity of the affidavit. Mitchell contends that the State's failure to correct Sheila's false testimony would constitute a due process violation and entitle him to a new trial. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence

favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). This is because a conviction obtained through the use of false evidence, known to be such by representatives of the State and allowed to go uncorrected, violates a criminal defendant's due process rights. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

The Illinois Appellate Court held that this claim was procedurally defaulted because Sheila's affidavit was unsigned and thus lacked the indication of reliability needed to toll the statute of limitations. *See* 735 Ill. Comp. Stat. 5/2-1401(c) (2006). The district court agreed that any claim based on Sheila's affidavit was procedurally defaulted.

On appeal, Mitchell argues that his due process claim was not procedurally defaulted because the Illinois Appellate Court "failed to apply the tolling criteria in a manner consistent with firmly established Illinois practice." Mitchell notes that § 2-1401 of the Illinois code permits a petitioner to seek relief from judgment based on newly discovered facts. *Id.* at 5/2-1401. Specifically, § 2-1401 allows for tolling of the two-year filing deadline where "the ground for relief is fraudulently concealed." *Id.* at 5/2-1401(c). Mitchell asserts that his combined petition and the unsigned affidavits of Sheila and Eric Mitchell adequately alleged a basis for obtaining relief from judgment based on perjured testimony, and thus the case should be remanded to the state court for an evidentiary hearing on those claims.

The district court and Illinois Appellate Court properly found that the unsigned affidavits do not constitute the "clear showing" required to establish fraudulent concealment and

toll the two-year limitation period under § 2-1401. *People v. Coleman*, 794 N.E.2d 275, 292 (Ill. 2002). To establish fraudulent concealment, a defendant "must specifically allege facts demonstrating that his opponent affirmatively attempted to prevent the discovery of the purported grounds for relief, as well as offer factual allegations demonstrating his good faith and reasonable diligence in trying to uncover such matters before trial or within the limitations period." *People v. Dodds*, 7 N.E.3d 83, 92 (Ill. App. Ct. 2014) (citing *Coleman*, 794 N.E.2d at 293). A signed and notarized affidavit is one well-established method of setting forth specific factual allegations. *See Thompson v. IFA, Inc.*, 536 N.E.2d 969, 972 (Ill. App. Ct. 1989) ("It is insufficient merely to assert that the basis for relief was fraudulent concealment; rather, petitioner must allege facts, supported by affidavit, demonstrating affirmative acts or representations by respondent designed to prevent discovery of the purported grounds for relief.").[4] Here, the affidavits were unsigned and unsworn. We therefore agree with the district court that this claim was procedurally defaulted.[5]

---

[4] Mitchell relies on *In re Marriage of Frazier* to argue that there is no requirement that allegations of fraud be supported by signed and notarized affidavits. 561 N.E.2d 160, 163 (Ill. App. Ct. 1990). But the *Frazier* court observed that § 2-1401 "permits parties to seek [r]elief from final orders and judgments … upon petition supported by affidavit or other appropriate showing as to matters not of record." *Id.* at 162 (alteration in original) (citation, internal quotation marks, and other punctuation omitted).

[5] Even assuming, arguendo, that Mitchell had established fraudulent concealment, he does not make a showing of cause and prejudice necessary to excuse the procedural default. *Bolton v. Akpore*, 730 F.3d 685, 696 (7th Cir. 2013) ("Procedural default may be excused … if the petitioner can show both cause for and prejudice from the default, or can demonstrate

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

that the district court's failure to consider the claim would result in a fundamental miscarriage of justice."). Mitchell did not suffer prejudice as there is no reasonable likelihood that additional information about the State's purported deal with Sheila would have affected the verdict. Sheila's credibility was vigorously attacked on multiple fronts by defense counsel. Even the prosecutor agreed that Sheila was an incredible witness and instead emphasized that Mitchell's version of events did not fit the physical evidence. The jury had ample reason to disbelieve Sheila but the physical evidence corroborated her testimony. Since there is an insufficient showing of prejudice and no indication of a fundamental miscarriage of justice, we agree with the circuit and district courts that an evidentiary hearing is not warranted.