NOTICE

Decision filed 12/29/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 231222-U

NO. 5-23-1222

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

<table>
<tr><td>THE PEOPLE OF THE STATE OF ILLINOIS,</td><td>)</td><td>Appeal from the</td></tr>
<tr><td></td><td>)</td><td>Circuit Court of</td></tr>
<tr><td>Plaintiff-Appellee,</td><td>)</td><td>Edgar County.</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>No. 15-CF-166</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>GARY PEAK,</td><td>)</td><td>Honorable</td></tr>
<tr><td></td><td>)</td><td>Matthew L. Sullivan,</td></tr>
<tr><td>Defendant-Appellant.</td><td>)</td><td>Judge, presiding.</td></tr>
</table>

JUSTICE McHANEY delivered the judgment of the court.
Justices Barberis and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Where postconviction counsel substantially complied with Supreme Court Rule 651(c) (Ill. S. Ct. R. 651(c) (eff. July 1, 2017)) in that she consulted with him by mail, reviewed the trial court record, researched his *pro se* claims, assisted him in presenting his claims with an amended petition, and filed a supportive legal memorandum, we affirm the trial court's order denying his claim.

¶ 2    The defendant was charged with, and convicted of, five felonies that involved sexual assaults of a minor under the age of 13. He was sentenced to two consecutive 15-year terms of imprisonment, plus two 12-year terms to be served concurrently with the 15-year terms; the fifth conviction merged into the other four.

¶ 3    On August 23, 2021, the defendant filed a petition for postconviction relief. On October 13, 2021, the court entered an order docketing the petition for further consideration and appointed counsel. The State did not move to dismiss the postconviction petition, and the case proceeded to

1

a third-stage evidentiary hearing, after which the trial court denied the defendant's postconviction petition on November 17, 2023.

¶ 4 On appeal, the defendant contends that his attorney did not provide him with a reasonable level of assistance at the second stage of the postconviction process as mandated by Illinois Supreme Court Rule 651(c). For the following reasons, we affirm.

¶ 5                                I. BACKGROUND

¶ 6 In September 2015, the State charged the defendant with the following three counts: (1) predatory criminal sexual assault of a child in that the defendant was over the age of 17 and committed an act of sexual penetration with a victim who was under the age of 13 (720 ILCS 5/11-1.40(a)(1) (West 2014)); (2) criminal sexual assault in that the defendant committed an act of sexual penetration with a minor victim under the age of 18 and the defendant was a family member (*id.* § 11-1.20(a)(3)); and (3) aggravated criminal sexual abuse in that the defendant committed an act of sexual conduct with a minor who was under the age of 13, and the defendant was over the age of 17 (*id.* § 11-1.60(c)(1)(i)).

¶ 7 On March 20, 2018, the defendant's trial attorney informed the court that he filed a motion asking the State to clarify the specific charges. Defense counsel stated, "My understanding, there would be—there are two acts of penetration that [the State] is alleging. So, [the State] will be moving to amend the information, without objection."

¶ 8 On March 21, 2018, the State formally filed an amended information charging the defendant as follows: (1) predatory criminal sexual assault of a child in that "defendant was 17 years of age or over and committed an act of sexual penetration, in that the [d]efendant placed his penis in the anus of a minor victim, who was under 13 years of age when the act was committed" (*id.* § 11-1.40(a)(1)); (2) predatory criminal sexual assault of a child in that the defendant

2

committed an act of sexual penetration by placing his penis in the mouth of a minor victim (*id.*); (3) criminal sexual assault in that the defendant committed an act of sexual penetration by placing his penis in the anus of a minor victim and the defendant was a family member of the minor victim (*id.* § 11-1.20(a)(3)); (4) criminal sexual assault in that the defendant placed his penis in the mouth of a minor victim and the defendant was a family member of the minor victim (*id.*); and (5) aggravated criminal sexual abuse in that the defendant committed an act of sexual conduct with a minor victim who was under 13 years of age and the defendant was 17 years of age or older (*id.* § 11-1.60(c)(1)(i)).

¶ 9                                    A. Jury Trial

¶ 10    On March 20, 2018, the defendant's jury trial began. Paul J. (Paul) testified he lived in Terre Haute, Indiana, with his four children, including A.J., who was born on December 12, 2001. The defendant was A.J.'s stepfather. On October 17, 2014, Paul's son, D.H., and A.J. knocked on his bedroom door. According to Paul, A.J. was distraught, was not making eye contact, and did not want to be there. D.H. told Paul that A.J. wanted to disclose something "about a discussion we had had prior about good touch, bad touch." Paul testified he had a conversation with his children about "good touch, bad touch, how adults should interact with children and what they should do if they were being abused." Paul testified he had this conversation with his children after observing A.J. kiss the defendant on the lips when he picked her up for a visit. Paul found this "odd" and stated, "I asked her why the kiss on the lips. And she replied, 'Because if we don't, he gets angry with us.' "

¶ 11    Paul asked A.J. what happened, and she stated the defendant touched her and she gestured toward her breasts and genitals. Paul testified that A.J. said she was naked when this occurred, and

3

that the defendant was wearing only a shirt. A.J. told Paul that the defendant made her touch his penis.

¶ 12   Paul called an abuse hotline and the Paris, Illinois, police. Paul took A.J. to the police station to give a statement. Paul and A.J. later returned to the Paris Police Department for a recorded interview.

¶ 13   Noelle Cope (Cope), a nurse practitioner at Sarah Bush Lincoln Health Care Center, testified she specialized in pediatrics and sexual abuse of children. She examined A.J. who informed her that the defendant touched her inappropriately. Cope asked A.J. how or where the defendant touched her. Cope testified:

> "She responded that she had been touched in several different places, that he had touched her boobs with his hands. That she, that he had touched her private area with his hand and fingers. That he had touched her private area with his lips and his tongue. That she had touched, or she had put her mouth on his private area. That he had tried putting his private area, his boy private in her butt and had tried putting his boy private area in her private area."

Cope testified A.J. stated the abuse began when she was approximately 5, 6, or 7 years old, and that the abuse stopped when she began her menstrual cycle at about 10 or 11 years of age.

¶ 14   Terry Rogers, an investigator with the Paris Police Department, testified he participated in a recorded interview with A.J. and the Department of Children and Family Services investigator Jeannie Faulkner. Rogers also interviewed the defendant in October 2014, who said that just prior to A.J.'s claims, the defendant and A.J. had an argument.

¶ 15   In the recorded interview, A.J. stated that her stepfather, the defendant, touched her inappropriately. According to A.J., her stepfather made her remove her clothing while on a bed.

A.J. stated the defendant was partially clothed and touched her "boobs" and her "private area" with his hands and his "private parts." A.J. reported multiple instances when the defendant inappropriately touched her genitals with his hands, penis, and mouth, and instances where the defendant forced A.J. to touch his genitals with her mouth.

¶ 16    On the date A.J. testified, she was 16 years old. When A.J. was about six years old, she lived with her mother, the defendant, and her sister, I.J. Approximately one month before the October 2014 disclosure, A.J.'s father noticed that defendant kissed her on the mouth when her father picked her up for visits. A.J.'s father asked her about that, and A.J. said the defendant would get mad if they did not kiss him on the mouth.

¶ 17    A.J. testified that she was hesitant to disclose the abuse due to concern for her mother. Eventually A.J. told her father that the defendant touched her in a sexually inappropriate manner. A.J. stated that on one occasion the defendant attempted to have anal intercourse with her by placing his penis on her anus after which she felt a sharp pain that made her cry. She testified that he would fondle A.J.'s breasts, kiss her, and "rub his penis anywhere he felt like it." A.J. stated that the defendant made her perform oral sex, meaning "using [her] mouth on his penis." The defendant also caused contact between his mouth and A.J.'s vagina.

¶ 18    The defendant testified that he was A.J.'s stepfather. In 2004, he began living with his wife, Shelly, A.J., and I.J. The defendant testified that Paul did not exercise regular visitation until A.J. was approximately 10 years old. The defendant stated that he was never alone with A.J. or I.J.

¶ 19    The defendant testified that he had a big fight with A.J. about her father not exercising his visitation time. According to the defendant, this argument occurred on October 17, 2014. The defendant denied that he touched A.J. inappropriately, made A.J. touch his penis, and/or attempted to put his penis inside of A.J.

5

¶ 20 Shelly Peak (Shelly) testified she lived with the defendant and their son. In 2004 or 2005, she lived with A.J., I.J., and the defendant in Clinton, Indiana. Later, the family moved to Paris, Illinois. Shelly testified that she and the defendant both worked at Walmart and attempted to coordinate their shifts so A.J. and I.J. were with Shelly's mother or with Paul. Shelly testified she had physical custody of A.J. and I.J. following her divorce from Paul in 2005. Shelly stated that Paul did not exercise his visitation rights for four years until he remarried in 2010 or 2011. Shelly testified that the defendant worked multiple jobs with varying hours. According to Shelly, it was very rare that the defendant was alone with A.J. and I.J.

¶ 21                                B. Verdict and Sentence

¶ 22 The jury found the defendant guilty on all five counts. Following the sentencing hearing, the trial court sentenced the defendant to 15 years' imprisonment on count I; 12 years' imprisonment on count III concurrent to count I; 15 years' imprisonment on count II consecutive to count I; 12 years' imprisonment on count IV concurrent to count II; and the court found that count V merged with counts I through IV. The defendant filed a motion to reconsider the sentence, which was denied.

¶ 23                                     C. Appeal

¶ 24 The defendant appealed claiming that he received ineffective assistance of trial counsel for failing to investigate additional witnesses; that the State failed to prove his guilt beyond a reasonable doubt; that his counsel provided ineffective assistance during jury selection; that his convictions for predatory criminal sexual assault and criminal sexual assault should be reduced to the lesser-included charge of aggravated criminal sexual abuse; that the trial court erred in sentencing the defendant to consecutive terms of imprisonment; and that the additional charges in the amended information should have been vacated.

6

¶ 25    The defendant alleged that his attorney failed to investigate, subpoena, and call certain witnesses that would have provided exculpatory evidence. However, he provided no information on appeal as to "what exculpatory evidence these witnesses would provide or the prejudice he suffered due to counsel's failure to investigate these witnesses." *People v. Peak*, 2020 IL App (4th) 180673-U, ¶ 43. The appellate court concluded that the record was inadequate to address this issue, and thus, the issue could be better addressed in a postconviction petition which would allow the defendant to develop a record to demonstrate that his attorney provided ineffective assistance. *Id.* ¶ 45.

¶ 26    The defendant next argued that the evidence was insufficient to establish his guilt beyond a reasonable doubt. Specifically, he said that the State's witnesses failed to make an in-court identification of him, and therefore the evidence could not have been sufficient to establish his guilt. In response, the appellate court noted that the defendant failed to recognize that four State witnesses, including the victim, A.J., referred to the defendant by name. The court concluded: "Although no in-court identification was made, a valid inference that defendant was the person accused by the victim and named in the charging documents could be made based on the testimony heard by the jury." *Id.* ¶ 49.

¶ 27    The defendant also claimed that his trial counsel was ineffective because two jurors who had been sexual abuse victims were not challenged. The court noted that the defendant's attorney questioned each of these jurors about their personal experiences and whether they could remain impartial, and both said that they could. The appellate court concluded that counsel's choice not to challenge the jurors was a matter of trial strategy. *Id.* ¶ 53.

¶ 28    The defendant next argued that his convictions should be reduced to the lesser-included charge of aggravated criminal sexual abuse because there was no medical evidence to establish

7

penetration. The appellate court found that A.J.'s testimony was sufficiently strong to establish penile penetration of her anus and mouth, and that medical corroborating evidence was not necessary to prove penetration. *Id.* ¶ 56 (citing *People v. Morgan*, 149 Ill. App. 3d 733, 738 (1986)).

¶ 29    The defendant also argued that the trial court's consecutive sentences were erroneous. Noting that the defendant forfeited this issue by not raising the argument at sentencing or in a posttrial motion, the appellate court concluded that the trial court did not err in sentencing the defendant to consecutive terms because consecutive sentences were mandatory for convictions of predatory criminal sexual assault of a child. *Id.* ¶ 57 (citing 730 ILCS 5/5-8-4(a)(2) (West 2014)).

¶ 30    Finally, the defendant argued that the amended information filed by the State on the second day of trial violated his due process rights. He asked the appellate court to vacate his convictions and sentences to count II (predatory criminal sexual assault of a child) and to count IV (aggravated criminal sexual assault). The appellate court concluded that the defendant waived this argument as his attorney did not object to the late amendment. In addition, the defendant could not establish that his attorney was ineffective for failing to challenge the amended information because "the charges in the amended information were not a surprise to defendant as they involved the same conduct and the same victim as the initial information." *Id.* ¶ 62. The court also found that the defendant was aware of the amended charges before trial began and was able to adequately prepare his defense. On that basis, the court found that the defendant failed to demonstrate prejudice due to his attorney's failure to challenge the amended information. *Id.*

¶ 31    The defendant sought leave to appeal this decision to the Illinois Supreme Court. That request was denied on March 24, 2021. *People v. Peak*, 167 N.E.3d 637 (2021).

8

D. Postconviction Process

¶ 33     On August 23, 2021, the defendant filed his *pro se* petition for postconviction relief, in which he raised multiple issues. First, the defendant alleged that the State's jury instruction on sexual assault (based on IPI Criminal No. 11.65E) was incomplete on the matter of malice or intent, stating that the definition of sexual penetration necessarily includes a "penetration." The instruction read: "The term 'sexual penetration' means any contact, however slight, between the sex organ or anus of one person and the sex organ or mouth of another person. Evidence of emission of semen is not required to prove sexual penetration." The defendant claimed that the instruction contained "penetration," but left out the "intrusion" element, allowing the jury to consider "any contact, however slight." He argued that because there was no eyewitness to the alleged event or medical corroboration, this "suggested the possibility that there was no penetration during the alleged incidents."

¶ 34     Second, the defendant alleged prosecutorial misconduct because the State failed to call "crucial" witnesses. Central to this argument was A.J.'s sister, I.J. Two years before the defendant's alleged assault of A.J., A.J. purportedly told I.J. that she had been sexually assaulted but did not say by whom, when, or where that alleged sexual assault occurred. The defendant argues that if I.J. had been called and testified about A.J.'s previous sexual assault claim, there would have been "serious doubt concerning the alleged victim's claims now" and potentially could have resulted in the jurors' doubt about his guilt.

¶ 35     Third, the defendant alleged that his trial counsel provided ineffective assistance in six ways: (1) trial counsel did not return any of the defendant's calls and only spoke to him for five minutes before every court appearance plus one substantive one-hour meeting without any discussion of possible witnesses and/or trial strategy; (2) trial counsel failed to interview at least

four people who would have testified at sentencing that they allowed the defendant to watch their children and they had zero concerns about him doing so; (3) trial court failed to interview at least six people that the defendant worked for or with "during the alleged incidents" who would have been able to provide testimony to contradict A.J.'s trial testimony and DCFS interview; (4) trial counsel never disclosed the State's discovery to him, except A.J.'s videotaped interview, never showed him a bill or particulars or a list of the State's witnesses, never investigated A.J.'s claims, did not object to the amended information at the start of trial, and agreed to the amendments; (5) trial counsel was ineffective for advising him to agree to a jury versus a bench trial during the "Me Too Movement" and because the case involved sexual conduct with a child and the jury members were not likely "going to listen to a sexual assault case *** without having some judgment or biased opinions, because it is human nature"; and (6) trial counsel was ineffective for failing to discuss the consequences for accepting or rejecting a plea deal, referencing the State's offer of "15 years with no appeal" two days before trial which he rejected because counsel did not inform him that his sentence could be more than 15 years.

¶ 36   Fourth, trial counsel was ineffective because he or she failed to proffer lesser-included offense instructions for aggravated criminal sexual abuse. Within this issue, the defendant asked the postconviction court to examine whether the jury could "rationally find defendant guilty" of aggravated criminal sexual abuse.

¶ 37   Fifth, trial counsel was ineffective because he or she failed to properly investigate the alleged incidents/accusations to cross-examine A.J. at trial. The defendant pointed out errors in A.J.'s statements about living in Paris, Illinois, when she was six years old, when in fact, she was eight years old when they lived there. He also stated that A.J. gave conflicting testimony about whether the defendant's sex organ merely touched or penetrated her anus. During the time of the

10

alleged sexual assaults, the defendant said that he worked and was "never home alone with the alleged victim." He stated that his attorney should have conducted interviews of his coworkers to establish this work schedule. He said that there was no medical evidence to support A.J.'s claim that she was anally assaulted. The defendant also pointed out various discrepancies in A.J.'s testimony about which room in the Paris trailer where the assaults occurred.

¶ 38     Sixth, the defendant claimed that his attorney was given a 15-year plea deal two years before trial and his attorney failed to advise him of the offer until after his trial and conviction. He claims that the attorney's failure to tell him about the plea offer violated his sixth amendment rights and also constituted a due process violation. He acknowledged that he told the court he was aware of a previous plea deal but failed to specify when he became aware of the plea offer.

¶ 39     Seventh, the defendant claimed that he was deprived of his sixth amendment right to the effective assistance of counsel because his attorney "tricked or coerced [him] into waiving his preliminary hearing." His attorney told him if he waived the hearing, he could receive a more manageable bond and return home to his pregnant wife. His attorney did not inform him that if he had his preliminary hearing, he would be informed of the evidence against him.

¶ 40     On October 13, 2021, the trial court entered an order finding that the petition should not be dismissed as frivolous or patently without merit and docketing the case for further consideration (725 ILCS 5/122 (West 2020)). The trial court also appointed postconviction counsel.

¶ 41     On August 26, 2022, during a hearing, postconviction counsel advised the court about the case status, stating the following:

> "[POSTCONVICTION COUNSEL]: I—have gone through his file. He sent me several transcripts. We've been communicating on—by mail. I just sent him a five page letter telling him that he needs to include affidavits with his Post Conviction Petition. So I

11

don't know how long it will take for him to produce those or even if he can produce those. He has a couple valid complaints I believe. I'd just like to give him some time to provide me with those affidavits.

> THE COURT: Do you want to use that October date?
>
> [POSTCONVICTION COUNSEL]: Can we? And I'll send him notice.
>
> THE COURT: Will it still be for status?
>
> [POSTCONVICTION COUNSEL]: Yeah, could we? Because I don't know if

he's going to have those affidavits."

¶ 42    On October 28, 2022, the trial court held a status hearing. Postconviction counsel informed the court that she had "been corresponding with Mr. Peak and I provided him some case law stating that he needs to provide me with some affidavits." She then stated: "He only sent some of them to me. I sent him another letter—letter saying he needed to send additional ones regarding certain other issues. I haven't heard a response from him yet." She asked the court to move the case to a later date for a status hearing "to see if he does send those to me." She indicated that if the defendant failed to send those affidavits by the next status hearing, she would file a postconviction petition "with the affidavits that I have in the file."

¶ 43    On February 24, 2023, the court called the case for a status hearing. Postconviction counsel advised the court:

> "I've been corresponding with Mr. Peak. I did provide a letter—or mail a letter to him asking him for certain affidavits, so that I could proceed. He responded but didn't send any affidavits. So I just need one more continuance. I'm going to write him a letter and I think what's going to happen is he'll probably just have to stand on the Motion he's filed."

The court granted her continuance request.

12

¶ 44     On May 26, 2023, postconviction counsel advised the trial court:

"Judge, he's not present for the record. He's in IDOC. This is a—he filed a *pro se* Post Conviction Petition. I have reviewed all of the issues in that *pro se* petition. I researched issues, have been corresponding with him, told him that I cannot amend his *pro se* petition because the issues that I found did not support the Post Conviction Petition. I think he needs to be writted back here and then I would just rest on his *pro se* *** petition."

¶ 45     On June 26, 2023, the defendant sent a letter to the trial court stating that he was having a problem in that his postconviction counsel "is trying to reccuse [*sic*] herself from my case saying that I have no merit concerning my issues." He enclosed a copy of a 2016 plea offer for a 10-year sentence in his underlying case stating that his trial attorney never told him about the plea offer. He stated that he only discovered this plea offer when he sought legal assistance to obtain a copy of his trial case file from the American Bar Association in preparation of his postconviction petition. He stated that if he had known about his plea offer, he "would have taken the offer instead of risking going to trial." He additionally stated that there was a communication gap between him and his postconviction attorney because "she is not understanding what I am trying to explain to her." He stated that he had only spoken with his attorney two times for a total of 15 minutes. He stated that she advised him that his case had no merit. The defendant asked the trial court: "Will I be appointed a new attorney? [W]ill I have to argue my Post on my own? Can you make *** [postconviction counsel] do her job, despite whatever her feelings are?"

¶ 46     On August 4, 2023, the defendant filed a "Post-Conviction Argument" which was his "amended" *pro se* petition containing three issues. With his first issue, the defendant contended

that his trial attorneys[1] did not inform him about the State's 2018, 10-year plea deal. He filed his own affidavit in support. His sister, Melissa Lamb, also filed her affidavit indicating that after her brother was charged with these crimes, she "repeatedly" asked him if he had been given any plea offers. The defendant consistently answered no to that question. She acknowledged that she was not present during any conversations the defendant had with his attorney. The second issue raised ineffective assistance of trial counsel for failing to proffer a lesser-included criminal jury instruction for aggravated criminal sexual abuse. The defendant argued that if his attorney had requested this instruction, the trial court would have given that instruction to the jury. He also argued that he would have pled guilty to this lesser charge. In support he attached his affidavit stating that his attorneys never discussed the possibility of seeking this alternative crime instruction on his behalf, and thus, provided him with ineffective assistance. The third issue also involved ineffective assistance. The defendant contended that in the two years he was represented by his attorneys, he left repeated messages but only received two calls back. The defendant and his wife had a substantive one-hour meeting with the attorneys, but they did not discuss trial preparation, testimonial preparation, trial strategy, and/or possible witnesses. His attorneys told him that no witnesses would help his case because any testimony offered would be inadmissible hearsay. He contends that his attorneys did not investigate possible witnesses or question the victim's statement.

¶ 47    On August 4, 2023, the trial court held a third-stage hearing on the defendant's "amended" *pro se* complaint.[2] At this hearing, the defendant and both of his trial attorneys testified.

---

[1]The defendant hired attorney Doug Lawlyes to represent him at trial. Later, Doug's wife, Sandra Lawlyes, became co-counsel.

[2]The State did not file an answer or move to dismiss the defendant's original and/or or amended postconviction complaint.

14

¶ 48    The defendant testified that he unsuccessfully tried to get a copy of his case file from his first trial attorney. He eventually contacted the American Bar Association for assistance, and it got the case file to him. In reviewing the file, the defendant found a State plea offer for a 10-year sentence if he pled guilty to the criminal sexual assault charge which would be served concurrently with a 5-year sentence on the aggravated criminal sexual abuse charge, plus the dismissal of any remaining charges. The defendant testified that if he had been informed of this offer, he would have accepted it. He acknowledged that he informed the trial court that when he had been given an offer, he declined it. The defendant explained that the offer he declined "was the original offer when I was first arrested in which I believe the State was asking for almost 70 years." The defendant also testified that he and his attorneys never discussed jury instructions, but he learned about the possibility of lesser-included offenses by conducting his own legal research. The defendant's third issue involved ineffective assistance of counsel because his attorneys did not communicate with him. In support, the defendant outlined his weekly unanswered calls but acknowledged that he spoke with his attorneys for five minutes before each court hearing, and that he also had a one-time hour-long meeting at the law office. He stated that when he retained Doug Lawlyes, he provided him with a list of witnesses to call, but the attorney did nothing with that list and never discussed the witnesses with him. The defendant informed his attorneys that he wanted to testify at trial but said that his attorneys did not prepare him to testify. The defendant said that after his conviction his attorneys did not accompany him to his probation department meeting and did not meet with him to discuss the presentence investigation report or sentencing in general.

¶ 49    On cross-examination, the defendant said that he no longer had the paper with the 70-year plea offer. He also clarified that during his one-hour meeting with his attorneys, they reviewed A.J.'s videotaped interview with the Children's Advocacy Center. The defendant confirmed that

15

none of the witnesses on the list he provided his attorneys could have provided him with an alibi but instead would have provided character testimony.

¶ 50 Melissa Lamb, the defendant's sister, testified that soon after the defendant was arrested, the prosecutor told her that "they did not have enough evidence to proceed[,] and they wanted him on the books *** that way *** [if] anybody else ever accused him there would be a record. So they were going to offer him something with probation attached to it." She also testified that the defendant used to watch her daughter without any issues. She testified that she had talked to "people in the court" and they informed her that the State was planning to take the case to trial and would make no offers. She testified that she asked the defendant if he had been given any offers, and he only referenced an offer for 70 years. Although she was not called as a witness at sentencing, if she had been called, she would have testified about the defendant's good character and that she did not believe he committed the crimes charged by the State. On cross-examination, she testified that she was very close to A.J. and that A.J. would have informed her if she was being sexually abused.

¶ 51 The State called the previous Edgar County public defender, William McGrath, to testify. Attorney McGrath was initially appointed to represent the defendant, and in that capacity he received a plea offer from the State of 10 years on one count, 5 years on another count to be served concurrently, and dismissal of the third count. McGrath stated that in all plea situations he reviewed the discovery in the case alongside the plea deal and then would send a letter to the defendant. He checked his file and located his letter to the defendant outlining the State's plea offer. He testified that he had no recollection of a 70-year plea offer, and his file contained no documentation regarding such an offer. He always asked the client at the next court hearing if he received the plea offer. If not, he provided the defendant with a copy at that court hearing, notated

16

his file, and put another copy of the plea offer in the file. When the State moved to admit attorney McGrath's letter to the defendant into evidence, the defendant exclaimed: "I've never seen that before in my life."

¶ 52    The State next called attorney Douglas Lawlyes (Douglas) who testified that he was hired by the defendant in 2015 to represent him in the underlying criminal case. Douglas's wife, Sandra Lawlyes (Sandra), assisted him in representing the defendant. Over the course of his representation, he had 20 to 30 meetings with the defendant, most of which were at the courthouse prior to hearings. Within these meetings, he and Sandra went over the discovery produced by the State and discussed the pros and cons of witnesses the defendant wanted to testify at trial. He testified that Sandra attempted to locate these witnesses. However, Douglas's recollection was that at least some of these potential witnesses had given statements to State investigators and/or DCFS, and based upon the content of those statements, testimony from those witnesses would have been detrimental to the defendant's case. Douglas also testified that Sandra would have discussed jury instructions with the defendant. Douglas confirmed that he did receive a plea offer from the State for 10 years on count II, 5 years on count III to be served concurrently, and dismissal of count I. The State originally sent the plea offer to attorney McGrath and then sent the offer to Douglas. Douglas testified that he would have discussed this offer with the defendant. He was also unaware of any 70-year plea offer from the State.

¶ 53    On cross-examination, Douglas testified that his practice was to mail a copy of any plea offer to the defendant and then discuss the offer with the defendant at the next hearing. Douglas said that he independently remembered discussing this plea offer with the defendant, and that the defendant was not interested in pleading guilty if he would be sentenced to prison and would have to register as a sex offender. In response to the offer, Douglas testified that he made a counteroffer

17

to the State of pleading guilty to a misdemeanor battery offense. In response, the State rejected the battery charge but said that it would get with A.J.'s father to get approval if the defendant was willing to plead open to a Class IV felony. The court followed up by asking Douglas if he discussed this possibility with the defendant. Douglas thought that he did, but that the defendant remained uninterested in that possibility primarily because he still would have had to register as a sex offender. Douglas testified that he did not prepare the defendant for the sentencing hearing and/or review the presentence investigation report. His belief is that Sandra would have handled those matters, but he acknowledged that he did not know if she did so.

¶ 54      On August 25, 2023, the hearing resumed with the State calling Sandra to testify. Sandra said that she got involved in the case at the request of her husband, Douglas, because the defendant was entrenched in his refusal to consider a plea, and the case needed to be prepared for trial. Sandra testified that she had at least one meeting with Douglas where she went through the discovery, discussed whether certain witnesses would be relevant to the State's case, and discussed possible motivations for, and possible defenses to, A.J.'s claims. She confirmed that the defense to the charges relied upon the defendant's innocence.

¶ 55      On cross-examination, Sandra testified that she could not recall if she took any phone calls from the defendant but confirmed that she had no notes in her file to confirm or detail any phone conversations with the defendant. Regarding discussions of potential trial witnesses, she stated that she only recalls the defendant wanting people who were family members, and thus could only provide character evidence, which was not relevant for trial. She indicated that she informed the defendant of the strengths and weaknesses of his case but had no discussions with him about possible pleas and confirmed that the defendant was uninterested in any plea if the plea meant that he would either receive a prison sentence or be placed on the sex offender registry. Sandra was

responsible for preparation of jury instructions. In response to a question about use of lesser-included offense instructions, she testified that she did not propose instructions on lesser-included offenses because the defendant was adamant that he was innocent, noting: "It would have been an interesting argument to make to the jury based on his testimony that somehow they should ask—or come back on a lesser included offense." Sandra confirmed that she had no notes in her file about meeting with and/or discussing the presentence investigation report and sentencing in general with the defendant, but that she did not know if her husband did. She testified that after the defendant was convicted, there were conversations about the defendant's coworkers submitting mitigation letters. The court asked Sandra if the defendant ever acknowledged that there might have been slight penetration, and she replied in the negative.

¶ 56 The State next called Amy Blystone (Blystone) to testify. Blystone testified that she is employed as a legal assistant in the Edgar County State's Attorney's Office; she worked when Mark Isaf (Isaf) served as the state's attorney for Edgar County; and was responsible for transmitting Isaf's communication of plea offers to whomever was defending a particular defendant. She testified that if Isaf communicated the offer verbally to a defense attorney, written confirmation of the offer was then sent to the defense attorney. Blystone also testified that there was no record of a 70-year plea offer being made to the defendant in this case. She testified that the offer that was made to the defendant in this case was originally sent to attorney McGrath and then was resent to attorney Doug Lawlyes. She said that she had no idea whether either attorney verbally communicated that offer to the defendant.

¶ 57 The defendant testified in rebuttal. He said that he had an hour-long meeting with Sandra, and at least 20 five-minute conversations with Douglas prior to every court hearing. Sandra did not discuss a plea offer at their meeting. On cross-examination, the defendant said that during his

19

substantive meeting with Sandra, they discussed trial strategy and reviewed discovery. The defendant always maintained his innocence during his meetings with the attorneys. He confirmed that he did not want to receive a prison sentence or to have to register on the sex offender list, stating: "I didn't want to admit to something that I didn't do. And I didn't want to take an offer for something I didn't do." He testified that he would have taken "some kind of offer": "I mean, even though you're innocent *** in some cases you still go to take a *** guilty plea just because there is no other option ***." Regarding the 10-year plea offer, the defendant confirmed that he was unaware of it, and even though he did not want to serve time in prison and/or be required to register as a sex offender, he testified that he would have taken that plea "just to be done with it, because *** I didn't want it to go any further."

¶ 58    The trial court questioned the defendant about Douglas's communication with the State that the defendant would plead to misdemeanor battery and submit to a sex offender evaluation and engage in any recommended treatment. The defendant stated that he did not know that Douglas made that offer, and that he had not agreed to that offer. The court also asked the defendant about his affidavit attached to his original postconviction petition. He confirmed that he signed the affidavit, which stated: "As I admit that there was penetration, however slight contact. My counsel should have discussed with me the lesser included instruction of Aggravated Criminal Sexual Abuse, aggravation by age." He explained that Sandra told him that the only way he could get this instruction was if he admitted penetration. Upon further questioning the court focused on the fact that the affidavit admitting penetration was signed under oath, the defendant went back and forth stating that there either was or was not penetration, before settling on confirmation of penetration.

¶ 59    On October 12, 2023, postconviction counsel filed a lengthy memorandum in support of the defendant's amended postconviction conviction. The supporting memorandum focused on four

20

issues: (1) whether trial counsel failed to provide the defendant with and/or discuss the State's plea offer of 10 and 5 years; (2) whether trial counsel's failure to interview witnesses before trial was prejudicial resulting in ineffective assistance; (3) whether trial counsel's failure to discuss and/or tender a lesser-included offense instruction resulted in ineffective assistance; and (4) whether trial counsel's failure to adequately prepare for the sentencing hearing was ineffective.

¶ 60 Arguments and the trial court's ruling occurred on November 17, 2023. Postconviction counsel referenced the memorandum in support of the postconviction petition and advised the court that the defendant reviewed and approved the memorandum before it was filed. Counsel met with the defendant before the court hearing to inquire if he wanted to make any additional arguments, and he did not. The court determined that there was no 70-year plea offer as the defendant alleged, and that the only offer he received, and he rejected, was the 10 and 5 years offer. In so ruling, the court concluded that the defendant was advised of the one plea deal he received. The court next determined that the defendant's contention regarding counsel's failure to interview and/or obtain witnesses was meritless as he had not indicated who these alleged witnesses were. With no suggestion of what the testimony could have been, the court concluded that the defendant was unable to establish that counsel was ineffective. Third, the court determined that the defendant's position in refusing to acknowledge responsibility for the charges was at the core of trial counsel's decision not to discuss or seek instruction on a lesser-included offense. Additionally, the court noted that it could not find there was a reasonable probability that the outcome of the case would have been different if a lesser-included offense instruction had been given to the jury. Finally, the court found that defendant's argument that counsel did not adequately represent him at sentencing failed, noting that the sentence was well within the range of possible sentences for "an incredibly serious offense."

21

¶ 61    The trial court verbally denied the defendant's postconviction petition on November 17, 2023, and created a docket entry on the same date. On November 27, 2023, the defendant filed his timely notice of appeal. The trial court entered its written order denying the defendant's postconviction petition on January 23, 2024.

¶ 62    On August 26, 2024, the defendant's postconviction counsel filed an amended[3] Illinois Supreme Court Rule 651(c) certificate. She certified that she communicated with the defendant to ascertain his constitutional deprivation claims and noted that the defendant was instrumental in assisting her with his postconviction petition. She stated that she had examined both the common law record and the transcribed report of proceedings, and with the defendant's assistance she amended his petition and discussed how best to present his claims "including but not limited to having [the defendant] approve the post-conviction petition prior to its filing and to assist this counselor with provided witnesses that were able to testify at his hearing."

¶ 63                                    II. ANALYSIS

¶ 64    The Post-Conviction Hearing Act provides a statutory remedy to criminal defendants who assert claims for substantial violations of their constitutional rights at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. A postconviction proceeding "is not a substitute for, or an addendum to, direct appeal." *People v. Kokoraleis*, 159 Ill. 2d 325, 328 (1994). "The purpose of a post-conviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, nor could have been, adjudicated previously upon direct appeal." *People v. Peeples*, 205 Ill. 2d 480, 510 (2002). The postconviction petition must "clearly set forth the respects in which petitioner's constitutional rights were violated" and "shall have attached thereto

_____

[3]Although the 651(c) certificate is labeled as "amended," we were unable to locate an original certificate in the record on appeal.

22

affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2022).

¶ 65    "The Act provides a three-stage mechanism for a defendant to advance such a claim." *People v. Addison*, 2023 IL 127119, ¶ 18. "At the first stage, the trial court must independently review the petition within 90 days of its filing and determine whether it is frivolous or patently without merit." *Id.*; 725 ILCS 5/122-2.1(a)(2) (West 2022). Thereafter, if the petition is not summarily dismissed, it must be set for further consideration in the second stage. 725 ILCS 5/122-2.1(b) (West 2022); *Addison*, 2023 IL 127119, ¶ 18.

¶ 66    "The second stage of postconviction review tests the legal sufficiency of the petition." (Internal quotation marks omitted.) *People v. Dixon*, 2018 IL App (3d) 150630, ¶ 12. The petitioner bears the burden at the second stage of making a substantial showing of a constitutional violation. *Id.* The circuit court may only dismiss a postconviction petition at this stage if the allegations, liberally construed in favor of the defendant and taken as true, do not make a substantial showing of a constitutional violation. *People v. James*, 2023 IL App (1st) 192232, ¶ 33. "The purpose of the first two stages is to determine whether an evidentiary hearing is even necessary." *People v. Fields*, 2020 IL App (1st) 151735, ¶ 42. A reviewing court applies a *de novo* standard of review to a trial court's dismissal of a postconviction petition at the second stage. *Addison*, 2023 IL 127119, ¶ 17.

¶ 67    At the third-stage evidentiary hearing, the circuit court "may receive proof by affidavits, depositions, oral testimony, or other evidence." 725 ILCS 5/122-6 (West 2022). At this stage, a defendant must prove by a preponderance of the evidence that he suffered a substantial denial of a constitutional right. *People v. Pendleton*, 223 Ill. 2d 458, 472-73 (2006). When a postconviction petition has been advanced to a third-stage evidentiary hearing, where fact-finding and credibility

determinations are made, a reviewing court will not reverse a trial court's decision as to whether there has been a substantial showing of a constitutional violation unless that finding is manifestly erroneous. *Id.* at 473. A manifest error is one that is clearly evident, plain, and indisputable. *People v. Coleman*, 206 Ill. 2d 261, 277 (2002).

¶ 68   Although the defendant's petition received a third-stage evidentiary hearing, and his petition was denied by the trial court, the defendant is not appealing from the third-stage ruling. Instead, he contends that his appointed postconviction counsel failed to comply with Supreme Court Rule 651(c) which denied him the required reasonable assistance of counsel at the second postconviction stage. The State contends that because this case reached a third-stage hearing, the defendant is prohibited from raising second-stage Rule 651(c) issues. See *People v. Pabello*, 2019 IL App (2d) 170867, ¶ 28. In response, the defendant argues that *Pabello* is inapposite because in that case, the issue was governed by a general reasonableness standard and the defendant failed to establish that he was prejudiced by his postconviction counsel's failings. We find that the State's reliance on this case is incomplete as the *Pabello* court noted that "Rule 651(c) did not govern counsel's performance during the third-stage hearing." *Id.* ¶ 35. The defendant is not claiming that Rule 651(c) controls the third stage of the postconviction process, nor is he contending that postconviction counsel's third-stage performance is at issue. Instead, he argues that postconviction counsel's second-stage performance damaged the presentation and viability of his claims at the third-stage hearing. Even if the case proceeded to a third-stage hearing, postconviction counsel's failure to comply with Rule 651(c) at the second stage can require a remand for compliance. See *e.g.*, *People v. Rankins*, 277 Ill. App. 3d 561, 563-64 (1996); see also *People v. Coons*, 2024 IL App (4th) 230552, ¶¶ 36-39; *People v. Watson*, 2022 IL App (5th) 190427, ¶¶ 42-46 (where the courts engaged in Rule 651(c) analyses even though the trial courts held third-stage hearings).

24

¶ 69    As the defendant's claims are based on counsel's alleged Rule 651(c) deficiencies, we turn to the requirements of the rule, which provides:

> "The record filed in that court shall contain a showing, which may be made by the certificate of petitioner's attorney, that the attorney has consulted with petitioner by phone, mail, electronic means or in person to ascertain his or her contentions of deprivation of constitutional rights, has examined the record of the proceedings at the trial, and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

If the amendment "would only further a frivolous or patently nonmeritorious claim," it is not necessary for counsel to amend a *pro se* petition. *People v. Greer*, 212 Ill. 2d 192, 205 (2004). Where postconviction counsel files a certificate under Rule 651(c) indicating compliance with the requirements of the rule, there is a rebuttable presumption that postconviction counsel has provided the reasonable assistance contemplated by the Post-Conviction Hearing Act. *People v. Rivera*, 2016 IL App (1st) 132573, ¶ 36. Rule 651(c) does not govern postconviction counsel's performance during the third-stage hearing; rather, "that performance is measured by the overarching reasonableness standard generally applicable to a postconviction proceeding." *Pabello*, 2019 IL App (2d) 170867, ¶ 35.

¶ 70    The defendant first contends that his postconviction attorney did not adequately present his claims at the second stage because she did not amend the *pro se* petition and/or supplement the petition with affidavits—failed to shape his claims into proper legal form. See *People v. Perkins*, 229 Ill. 2d 34, 44 (2007) (purpose of Rule 651(c) certificate is to ensure that counsel shapes defendant's claims into proper legal form and presents those claims to the court). While the defendant argues that Rule 651(c) mandates that postconviction counsel "clean up" the *pro se*

25

postconviction petition, and that postconviction counsel failed to do so, he does not provide support for his claim. The transcripts of the multiple status-type court conferences reflect that the defendant and his attorney corresponded with each other about the people he needed to contact for supportive affidavits, and about his legal claims. During the May 26, 2023, hearing, the attorney informed the court that through this series of letters and based upon legal research of the defendant's original issues, she concluded that she could not amend his petition because "the issues that I found did not support" his petition. The defendant does not dispute that he engaged in written communication with the attorney and provides no copies of those written communications that could have possibly shed additional light on why counsel did not find merit in the other issues he raised in his original petition.

¶ 71    On the date of the hearing, the defendant presented his *pro se* amended petition apparently based upon his written communications with counsel. While the defendant now takes issue with counsel's failure to amend his original petition, ultimately an amended petition was filed, and counsel presented the court with a lengthy memorandum in support of the issues it raised.

¶ 72    The defendant additionally argues that counsel originally informed the trial court that he made "a couple valid complaints"—then proceeded to drop most of his original claims, even going so far as to state that the petition lacked merit. We find that counsel's passing comment that the defendant's initial *pro se* postconviction petition "has a couple valid complaints I believe," does not form the basis of inadequate representation. When postconviction counsel was able to carefully review and factually and legally research the defendant's claims, she determined that her belief was mistaken.

¶ 73    The defendant next argues that counsel provided inadequate representation because she did not supplement the petition with affidavits. The defendant states that postconviction counsel

26

directed him to obtain witness affidavits, instead of counsel obtaining the affidavits on his behalf. Beginning on August 26, 2022, counsel informed the court that she had directed the defendant to obtain these affidavits. By the October 28, 2022, hearing, the defendant had obtained an unspecified number of affidavits. On February 24, 2023, she informed the court that she had again asked the defendant to obtain and send her supporting witness affidavits and informed the court that if she did not receive the affidavits that the defendant would likely have to stand on his original petition. Then on May 26, 2023, postconviction counsel informed the court that she had reviewed and researched all issues raised by the defendant in his complaint and had advised him that she could not amend the original petition because she had determined that the issues lacked merit.

¶ 74    The defendant contends that postconviction counsel did not comply with Rule 651(c) because she did not obtain the affidavits herself, and thus she did not adequately assist him in preparing his petition for the court's consideration. We disagree. First, the record on appeal amply reflects that the individuals from whom the defendant sought testimony for the criminal trial were character witnesses—witnesses who would say that the defendant was of good character or witnesses whose children the defendant babysat without issue. We note that the defendant does not identify the witnesses from whom he wanted affidavits to support his postconviction petition, but presumably the affidavits would have included some of these character witnesses. While the defendant wanted these witnesses to provide affidavits and/or testimony, he presents no argument on appeal about this purported testimony and how it could have supported his claims and impacted the outcome of the evidentiary hearing.

¶ 75    Next, the defendant argues that postconviction counsel inexplicably abandoned some of his claims by presenting the amended postconviction complaint containing only the three issues. The issues raised in his amended postconviction petition were (1) trial counsel's failure to advise

27

him of the State's 2018 10-year plea deal, (2) trial counsel's failure to proffer a lesser-included criminal jury instruction for aggravated criminal sexual abuse, and (3) trial counsel's failure to consistently meet with the defendant; failure to discuss trial preparation, trial strategy, and potential witnesses; and failure to investigate potential witnesses or question the victim's statement.

¶ 76    We note that the defendant testified at the hearing that the three claims in his amended petition were the only claims he wanted to pursue. "Post-conviction counsel is only required to investigate and properly present the *petitioner's* claims." (Emphasis in original.) *People v. Davis*, 156 Ill. 2d 149, 164 (1993). Second, although counsel also did not amend the petition to raise or supplement certain claims, she filed a well-researched 14-page memorandum supporting the defendant's amended three-issue *pro se* postconviction petition. Having reviewed the lengthy memorandum counsel prepared in support of the defendant's amended *pro se* petition and the defendant's testimony at his third-stage hearing, we conclude that counsel thoroughly and adequately presented the defendant's claims to the court. *Id*.

¶ 77    The defendant next argues that the record does not explicitly reflect that postconviction counsel complied with Rule 651(c) in two respects: (1) that she actually examined the record of the trial court proceedings; and/or (2) that she consulted with the defendant to ascertain his claims of constitutional deprivation. This argument ignores the fact that postconviction counsel filed her Rule 651(c) certification. We acknowledge that the certificate was filed late, but she did file one and thus complied with the rule.

¶ 78    Compliance with Rule 651(c) is mandatory. *Addison*, 2023 IL 127119, ¶ 21 (citing *Perkins*, 229 Ill. 2d at 50). After postconviction counsel files a Rule 651(c) certificate, there is a rebuttable presumption that counsel provided reasonable assistance. *Id.* (citing *People v. Custer*, 2019 IL

123339, ¶ 32). The burden to rebut this presumption lies with the defendant. *Id.* (citing *People v. Gallano*, 2019 IL App (1st) 160570, ¶ 26). As the defendant did not provide any information to rebut the presumption that counsel provided reasonable assistance, we conclude that postconviction counsel appropriately examined the record of the trial court proceedings and consulted with the defendant to ascertain his claims.

¶ 79    Based upon our review of the record, we conclude that appointed counsel amply complied with the requirements of Rule 651(c) at the second stage of the proceeding.

¶ 80                                III. CONCLUSION

¶ 81    For the above reasons, we affirm the judgment of the Edgar County circuit court.


¶ 82    Affirmed.